Jeannine L. BAKER and James A. Baker, Appellants (Plaintiffs below),

v.

George William COMPTON d/b/a Compton Climate Makers and Williamson Company, Appellees (Defendants below).

No. 2–582A140.

Court of Appeals of Indiana, Second District.

Oct. 25, 1983.

Kenneth L. Andrews, John T. Grimes, Kokomo, for appellants.

James P. Seidensticker, Jr., Daniel C. Emerson, Bose, McKinney & Evans, Indianapolis, Joe F. Watson, Watson & Hobbs, Tipton, for appellees.

SHIELDS, Judge.

Appellants, Jeannine L. Baker and James A. Baker (Baker), appeal the judgment for appellee, George William Compton d/b/a Compton Climate Makers (Compton) and against Baker on Compton's counterclaim for foreclosure of a mechanic's lien. Baker sued Compton and a second defendant, Williamson Company, (Williamson) for rescission of a contract to purchase from Compton and have Compton install heating and air conditioning equipment in an existing three-story building owned by Jeannine Baker being renovated by James Baker. Baker alleged Compton performed certain installation work in an unworkmanlike manner and, along with Williamson, recommended furnaces of insufficient capacity to heat the intended area. Compton counterclaimed for foreclosure of a mechanic's lien he had filed against the property. Baker raises three issues on appeal:

1) whether there was sufficient evidence to support the judgment for Compton on his counterclaim;

2) whether the trial court erred in failing to apply the principle of mitigation of damages;

3) whether the damages awarded Compton were excessive.

We remand for correction of the judgment and affirm subject to the correction.

1. The hot water heaters were not delivered to the building or the trailer, but were "on hand".

The record shows James A. Baker and Compton entered into a Sales and Installation Contract on November 15, 1976 pursuant to which Baker agreed to buy and Compton agreed to sell and install thirteen (13) gas furnaces, thirteen (13) electric air conditioners, and ten (10) gas water heaters in an existing three story building in Tipton, Indiana, Baker was renovating for commercial and residential use.

Payment of the $27,000 purchase price was to be in installments, the first of which was "$12,000 on delivery of equipment for 1st and 2nd floors of Owners (sic) building. JAB (approx. 21–28 days)." Record at 144. The contract provided work was to commence immediately, progress as rapidly as possible, and be completed by June 1, 1977.

Compton began work November 15, 1976, the day of the contract. All thirteen furnaces were delivered either to Baker's building or to Compton's trailer in front of the building by December 3, 1976 when Baker and Compton disagreed over the ability of the two installed furnace units to heat the retail store in which they were placed and Compton orally demanded the initial payment of $12,000 under the contract. Seven air conditioners were also delivered to Compton's trailer by December 3, 1976.[1]

A meeting was arranged in mid December, 1976, at which Williamson assured Baker the two installed units would heat effectively when the remaining units were installed and functional. Baker requested that Compton begin the third furnace installation. Compton again orally demanded payment of the $12,000 installment due under the contract before he would resume installation. Baker offered to pay $3,000 but refused to pay $12,000, stating Compton had not performed $12,000 worth of work. Compton refused to accept less than the $12,000 due and performed no work under the contract after December 3, 1976.

Record at 446.

On December 17, 1976, Compton, through counsel, made formal written demand for payment of the $12,000, advising Baker if payment was more than ten days delinquent, he would deem the contract defaulted. Record at 422. On approximately December 27 or 28, 1976, Baker telephoned Compton and told him he could come retrieve his equipment from the building. Compton declined to do so at that time believing the equipment for the first and second floors had to remain delivered for the ten days he had given Baker to pay the $12,000 or Compton would be in breach of the contract.

When Compton had not received payment by January 4, 1977, (his counsel advised him to wait a bit longer than ten days after the letter of December 17, 1976) he returned to the Baker building intending to take back the uninstalled but delivered equipment. He found the second and third floors were locked.[2] He did retrieve the one furnace remaining uninstalled on the first floor. Compton telephoned Baker to inquire about his equipment but Baker told him to talk to his lawyer.

On January 10, 1977, Compton's counsel again wrote to Baker advising him the contract was now considered defaulted by Compton. Record at 429. The letter informed Baker he could take delivery and pay for the three furnaces and seven air conditioners in the trailer outside the building or Compton would return them to the manufacturer for a refund, less a handling charge, which he would charge to Baker. Baker did not respond and Compton returned the equipment for a refund.

On January 31, 1977, Compton executed a notice of intention to hold a mechanic's lien which was recorded February 1, 1977. Baker brought suit to rescind the contract on March 16, 1977 and Compton counterclaimed for foreclosure of his $23,296.53 mechanic's lien. Baker appeals the trial court's judgment for defendants Compton and Williamson and against Baker on the complaint and in favor of Compton and against Baker on the counterclaim in the amount of $23,296.53 plus attorney's fees of $4,200. His appeal challenges the judgment in favor of Compton on the counterclaim and the court's findings in that regard.[3]

## I. Applicability of Uniform Commercial Code

Where, as here, the trial court has on its own motion made findings pursuant to Indiana Rules of Procedure, Trial Rule 52(A), this court will not set aside such findings or conclusions unless they are clearly erroneous. *Mishawaka Brass Mfg. v. Milwaukee Valve Co.*, (1983) Ind.App., 444 N.E.2d 855, 857. The judgment controls as to any issue not covered by the findings and must be upheld if sustainable on any theory. *Id.*; Trial Rule 52(D). In determining whether the findings are clearly erroneous, we will neither weigh the

---

2. The second and third floors had never been locked previously.

3. Compton and his employees had previously installed gas pipe lines in the building at the request of Baker as an emergency "rush" job to be completed by the November 1, 1976 deadline set by the gas company for new hook-ups. Compton testified and the court found the gas line installation was performed pursuant to an oral contract, Compton incurred reasonable labor and material costs totaling $4,128.15, Compton demanded payment of Baker, Baker failed to pay and Baker failed to prove performance of the gas line work in an unworkmanlike manner. The court also found the previous gas line work was outside the contract of November 15, 1976. Baker's appeal does not contest any of these findings pertaining to the oral contract. Therefore, the findings and that portion of the court's judgment which represents the $4,128.15 due under the oral contract stands unchallenged.

Prior to the written contract of November 15, 1976, Compton arranged for personnel from the manufacturer with whom it dealt, Williamson, to examine the Baker building, to calculate the building's heat loss and to recommend the quantity and size of furnaces necessary to heat the renovated building. The Williamson representative testified and the court found the heat loss calculations were performed in accordance with reasonable engineering standards of the heating and cooling industry, were based upon a description of the finished building provided by Baker, and that Baker had approved the size and quantity recommendations. Again, Baker has not challenged these findings relating to Williamson nor appealed the trial court's judgment in favor of Williamson.

evidence nor judge the credibility of the witnesses but will consider only the evidence in the record and reasonable inferences therefrom which support the judgment. The findings will be disturbed only if the record lacks facts or reasonable inferences which support them. *Indiana Tri-City Plaza Bowl, Inc. v. Estate of Glueck,* (1981) Ind.App., 422 N.E.2d 670, 674.

■ The trial court's findings reveal the written contract of November 15, 1976 was treated as a sale of goods under Article 2 of the Uniform Commercial Code (UCC). While Baker does not explicitly attack this treatment of the contract as falling within the UCC, we nevertheless deem it sufficiently important to merit our comment because our resolution of the issue on appeal necessarily involves application of provisions and principles of the UCC.

Article 2 of the UCC applies to "goods", which are defined in part as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale. . . ." I.C. 26–1–2–105 (Burns Code Ed.1974). Furnaces, air conditioners, water heaters, piping and other pieces of equipment fit within the definition of goods. *Howard Dodge & Sons, Inc. v. Finn,* (1979) Ind.App., 391 N.E.2d 638.[4] However, the November 15, 1976 Sales and Installation Contract signed by James A. Baker and George William Compton d/b/a Compton Climate Makers created a commitment to provide installation services as well as to sell the goods.

Such contracts are not, because of their mixed nature, automatically outside the scope of Article 2. The recognized purpose of the UCC is to promote uniformity in commercial transactions and the scope of goods should not be narrowly construed so as to contravene that purpose. *Thompson Farms, Ind. v. Corno Feed Products,* (1977) 173 Ind.App. 682, 366 N.E.2d 3, 16 (quoting *Pittsburgh-Des Moines Steel Co. v. Brookhaven Manor Water Co.,* (7th Cir.1976) 532 F.2d 572, 580). As explained by the United States Court of Appeals for the Eighth Circuit:

"[W]e find a dearth of authority going to a point relied upon . . . , namely, that the Code was not meant to cover 'nondivisible mixed [goods and services] contracts of this type.' Rather, the cases presenting mixed contracts of this type are legion. The test for inclusion or exclusion is not whether they are mixed, but, granting that they are mixed, whether their predominant factor, their thrust, their purpose, reasonably stated, is the rendition of service, with goods incidentally involved (e.g., contract with artist for painting) or is a transaction of sale, with labor incidentally involved (e.g. installation of a water heater in a bathroom)."

*Bonebrake v. Cox,* (8th Cir.1974), 499 F.2d 951, 960 (footnotes omitted). *See Pittsburgh-Des Moines Steel Co. v. Brookhaven Manor Water Co.,* cited with approval in *Uebelhack Equip., Inc. v. Garrett Bros.,* (1980) Ind.App., 408 N.E.2d 136, n. 1.

The predominant thrust of a mixed contract is a factual question determined by a review of the contract and the circumstances surrounding the formation and contemplated performance of the contract. *Glover School & Office Equip., Inc. v. Dave Hall, Inc.,* (1977) Del.Super., 372 A.2d 221, 223. The relationship of the cost of goods to the total contract price is one factor to consider in determining whether the thrust of a contract is goods or services. *See Uebelhack Equip., Inc. v. Garrett Bros.,* 408 N.E.2d at 137, n. 1. *See also Lincoln Pulp & Paper Co. v. Dravo Corp.,* (1977 N.D. Maine) 436 F.Supp. 262, 275; *Glover School & Office Equip., Inc. v. Dave Hall, Inc.,* 372 A.2d at 223. Although there is no price breakdown in this contract, the evidence shows the cost of equipment represented the majority of the total contract price.

We note the presence of design or engineering services, rather than mere installation services, may tip the thrust of the contract toward the services side. *See, e.g.,*

---

**4.** We note the court in *Dodge* mentions, but does not discuss, the significance of the fact the contract included installation as well as the sale of goods and the goods had, in fact, been at least partially installed. 391 N.E.2d at 641.

*Lincoln Pulp & Paper Co. v. Dravo Corp.,* 436 F.Supp. at 275. The subject contract involved only installation services.[5]

Further, if the cause of action on a mixed contract centers exclusively on the materials or the services portion of the contract, that fact may weigh heavily in the determination of the predominant aspect of the contract. *See Glover School & Office Equip., Inc. v. Dave Hall, Inc.,* 372 A.2d at 223; *Annot.,* 5 A.L.R. 4th 501, 506 (1981). Such an approach is of little assistance here, however, for Baker complained of the inadequacy of the equipment as well as the services and Compton's counterclaim on the mechanic's lien similarly covered both labor and materials.

We are satisfied the sale of furnaces, air conditioners, and other equipment was the predominant factor of this contract. The contract was primarily for the sale of equipment and the installation services, though not unimportant, were incidental to that sale.

We decline to follow the approach used in *Stephenson v. Frazier,* (1980) Ind.App., 399 N.E.2d 794, *transfer denied on other grounds,* (1981) Ind., 425 N.E.2d 73 (*criticized in* Bepko, *Contracts, Commercial Law, and Consumer Law,* 14 Ind.L.Rev. 223 (1981)) whereby the contract was divided into its service and goods components then governed by the common law and the UCC, respectively. We deem the uniformity and clarity sought to be promoted by the UCC are better served by determining the predominant thrust of a mixed goods and services contract. Where, as here, the predominant thrust of the contract is the sale of goods, the purposes of the UCC are furthered by treating the contract as falling entirely within the jurisdiction of the UCC rather than dividing it into service and goods components.

## II. Sufficiency of the Evidence

Baker contends the evidence is insufficient to support the court's judgment for Compton on his counterclaim because it is insufficient to support the court's finding Compton performed his obligations as provided in the contract rendering payment of the first installment of $12,000 due. His argument is two-pronged. Baker first contends Compton demanded payment prematurely by demanding it on approximately December 3, 1976, eighteen days after the contract of November 15, 1976 rather than in approximately 28 days as provided in the contract. Baker additionally argues Compton's demand for payment was premature because Compton had not delivered "equipment" as required by the contract. Therefore, Baker argues it was Compton, rather than Baker, who breached the written contract by prematurely demanding payment and refusing to continue work until payment was received.

The UCC provides that unless otherwise agreed, all goods called for in the contract must be tendered in a single delivery and payment is due only upon such tender. I.C. 26–1–2–307 (Burns Code Ed.1974). As evidenced by the written contract, the parties otherwise agreed. Pursuant to I.C. 26–1–2–301 (Burns Code Ed.1974), Compton was obligated to transfer and deliver and Baker was obligated to accept and pay in accordance with the contract.

The contract provides, in pertinent part, payment shall be made as follows: "$12,000 on delivery of equipment for the 1st and 2nd floors of Owners (sic) building. JAB (approx. 21–28 days)." We are unpersuaded by Baker's contention Compton breached the contract by prematurely demanding payment of the $12,000 on the eighteenth day after the contract was executed. We need to look no further than the unambiguous language used in the contract,

---

**5.** The record shows Compton arranged for Williamson to evaluate Baker's building and determine the equipment necessary to heat and cool it, *i.e.,* to "design" the heating and cooling system. However, these services, if they may be correctly considered design services, cannot weigh in our determination of the main thrust of the contract because they were not performed by Compton. Also, the "design" services were performed prior to the contract between Compton and Baker because the contract specifically enumerates the quantity, type and size of the heating and cooling units.

*i.e.,* "approximately", and will give effect to the plain meaning of the word. *See Shrum v. Dalton,* (1982) Ind.App., 442 N.E.2d 366, 369.

Because of the use of "approximately" and the appearance of Baker's initials beside the parenthetical phrase, we do not find demand for payment three days earlier than the time range specified in the parenthetical to have been so premature as to have constituted a breach by Compton.[6]

Baker's second argument, that equipment for the first and second floors was not delivered when Compton demanded payment and refused to continue work without payment, also fails to persuade us. The contract calls for Compton to supply and install thirteen gas furnaces, thirteen electric air conditioners and ten gas hot water heaters in Baker's three-story building. In his brief, Baker argues Compton prematurely demanded payment because all the equipment described in the contract was not delivered. However, as Baker acknowledges, the contract called for delivery of equipment for the first and second floors, not delivery of *all* the equipment covered by the contract, before the $12,000 installment became due. His contention all the equipment under the contract was to be delivered before payment of the $12,000 was due does not address the issue whether equipment for the first and second floors was delivered before the payment was demanded. In any event our independent review of the record reveals the argument is meritless.

Unlike the argument regarding timing of the demand, Baker's delivery argument cannot be resolved simply by reading the terms of the payment clause in the contract. Rather, to determine the intended meaning of "equipment", to ascertian what equipment was destined for the first and second floors, and to define "delivery" as used in the contract, we must not only construe the contract as a whole, but must resort to extrinsic evidence to resolve any ambiguities. *See Jones v. City of Logansport,* (1982) Ind.App., 436 N.E.2d 1138.

Viewed most favorably to the trial court's judgment, the testimony in the record reveals seven "units" were destined for the first and second floors.[7] The evidence shows thirteen furnaces were delivered either inside Baker's building or to Compton's trailer parked near the building as were numerous pieces of miscellaneous equipment necessary to their installation.[8] The evidence further shows seven air conditioners were delivered to the on-site trailer. However, the evidence is unequivocal that no water heaters were delivered to the building or the trailer, but that Compton had the heaters "on hand". Record at 446, 474. Therefore, the intended meaning of "equipment" as used in the contract is crucial to our determination whether Compton met his contractual obligation to deliver equipment for the first and second floors before calling for payment of the $12,000.

The record reveals the furnaces and air conditioners were of greater significance to the parties' bargain than were the hot water heaters. In the contract itself, the furnaces and the air conditioners are specifically described by size, B.T.U. and model number. The hot water heaters are described simply as "10–Gas hot water heaters." In addition, prior to execution of the contract, a representative of Compton's supplier, Williamson, conferred with Baker concerning his plans for renovating the

6. Additionally, viewed most favorably to Compton, the record indicates the parenthetical timing provision, which Baker initialed, was added to the contract to meet his objection to the money being due immediately upon delivery of the equipment. The parenthetical was added to make payment due by Baker approximately when payment was due by Compton to his supplier.

7. One of the contract provisions allows Baker three weeks from the contracting date to "elect not to have the five (5) units" installed on the third floor. However, testimony in the record reveals a total of six units were to be installed on the third floor, five in the planned apartments and one in the hallway.

8. Baker acknowledged in his testimony the "furnace units" for the first and second floor were delivered some time in November, well before Compton first demanded payment in early December. Record at 231, 196.

building, conducted a heat loss calculation based upon those plans, and determined what size and number of furnaces would heat the room spaces sufficiently. The contract of sale and installation was drafted based upon those recommendations. In contrast, there is no indication the consultation with Compton's supplier included consideration of a particular size or type of water heater or included any consideration of water heaters. There is thus some degree of evidence the hot water heaters were not the crux of the contract but that the furnaces and air conditioners were. Furthermore, viewed most favorably to Compton, the record shows the parenthetical provision making the $12,000 due in approximately 21 to 28 days was added to the contract for Baker's benefit to make Baker's payment of the $12,000 due approximately when Compton's payment for the heating and air conditioning equipment was due to Williamson, his supplier.

The trial judge found Compton had performed the obligations required of him under the contract until Baker refused to make the $12,000 payment. This finding is supported by the determination that the intent of the parties at the time of the contract was to have payment of the $12,000 conditioned upon delivery of the heating and cooling equipment for the first and second floors, not upon delivery of the water heaters. Thus, there is evidence in the record to support the judge's finding Compton met his obligation under the contract before demanding payment.

The trial court's finding is also supportable on a ground centering on the meaning of "deliver". The contract does not specify where or to whom delivery of equipment for the first and second floors is to be made, whether inside Baker's building or indeed even to Baker's building. Because Compton had to purchase the equipment from his supplier, the trial judge could have concluded "deliver" referred to delivery of the equipment to Compton. See I.C. 26–1–2–308 (Burns Code Ed.1974) (where place for delivery not specified, presumed to be seller's place of business). The fact the parenthetical provision making Baker's $12,000 payment due in approximately 21 to 28 days was added to the contract to key the due date of the $12,000 payment to the due date of Compton's payment to his supplier for the furnaces and air conditioners would lend support to such a conclusion. Therefore, the lack of delivery of the water heaters to the site or inside Baker's building is immaterial because the record shows Compton had the water heaters "on hand".

### III. Damages

■ Baker's final two arguments concern the amount of damages awarded to defendant Compton on his counterclaim.[9] As discussed above, the trial court found Baker breached the contract by refusing to make payment when due. The court found Baker accepted the equipment delivered inside his building by locking Compton out of the building thereby depriving him of any opportunity to correct any problems. The court also found Baker accepted the equipment by failing to properly reject it by describing its defects with particularity. I.C. 26–1–2–605 (Burns Code Ed.1974); I.C. 26–1–2–606 (Burns Code Ed.1974). Therefore, the trial court found Baker owes

9. The court's judgment foreclosed the mechanic's lien Compton filed to secure the debt he deemed owed him under the oral contract and the written contract of November 15, 1976. We have determined the written contract falls within the purview of the UCC. Although our research has failed to reveal a case arising under similar circumstances, if the requirements of the mechanic's lien statute are met, I.C. 32–8–3–1 to –15 (Burns Code Ed., Repl. 1980 and Supp.1982), there is nothing to preclude one from filing a mechanic's lien to secure a debt owed by virtue of a contract whose predominant thrust is the sale of goods.

The court found the lien was timely filed and ordered its foreclosure. Baker has not challenged this finding nor raised any issue concerning the validity of the lien. Although the burden of proving compliance with the statutory scheme and entitlement to the lien was on Compton as claimant, *Marshall County Redi-Mix v. Matthew*, (1983) Ind.App., 447 N.E.2d 1165, Baker has waived any failure of proof by Compton. Indiana Rules of Procedure, Appellate Rule 8.3(A)(7). Baker has challenged only the amount of Compton's recovery; therefore, the only issue before us is that amount.

Compton for the contract rate of the accepted goods. I.C. 26–1–2–607(1) (Burns Code Ed.1974). Baker has not challenged these findings and therefore we accept them.

The court further found Compton incurred reasonable equipment expenses of $14,348.32 and $2,162.00 for the equipment accepted by Baker under the written contract and reasonable labor expenses in connection with the accepted equipment of $2,685.00. The court found Compton incurred reasonable material costs of $1,658.65 and labor costs of $2,442.50 in connection with an earlier oral contract to install the gas pipelines in Baker's building. Therefore, the court's judgment awarded Compton $23,296.53, interest, and attorney's fees of $4,200.00.[10] Baker claims these damages awarded for his breach are excessive because 1) they are not within the scope of the evidence and 2) because Compton failed to mitigate his damages by returning all the equipment delivered inside Baker's building to his supplier for a refund. We will discuss his mitigation of damages argument first.

■ Even assuming for the purpose of addressing Baker's argument, but not deciding, a seller under the UCC has an obligation to mitigate damages by taking back accepted goods from a buyer, Baker's argument must fail. *Compare Equilease Corp. v. D'Annolfo,* (1978) 6 Mass.App. 919, 379 N.E.2d 1130 (where buyer accepts goods, seller under no duty to repossess and resell to mitigate but may sue for contract price) *with Zippy Mart of Alabama, Inc. v. A & B Coffee Service, Inc.,* (1980) Ala., 380 So.2d 833 (where buyer repudiates contract before acceptance, seller under duty to resell to mitigate). There is sufficient evidence Compton attempted to mitigate its damages by returning the equipment delivered but was thwarted by Baker when Baker locked areas of the building which had never before been locked. *See Colonial Discount Corp. v. Berkhardt,* (1982) Ind.App., 435 N.E.2d 65.

The record shows Baker telephoned Compton approximately December 28, 1976 and told him he could come get his equipment. Compton declined at that time upon advice of counsel. Compton had given Baker notice by letter dated December 17, 1976, he had ten days to pay the $12,000 due or Compton would consider the contract breached. Compton was advised to allow a few more than ten days before considering the contract breached by Baker and it was during this ten to twelve day time span Baker indicated the equipment inside the building could be reclaimed. Compton relied on his belief the equipment had to remain where delivered in the building until the ten to twelve days he had given Baker expired or Compton would be in breach of the contract. However, on or about January 4, 1977, after expiration of the ten to twelve day period, Compton went to Baker's building to pick up his equipment as Baker had earlier suggested. Compton found the accessways to the upper floors of the building were locked. He contacted Baker to obtain a key but was informed he would have to deal with Baker's attorney. Compton did pick up and return for credit all the equipment for Baker's building that was not installed or locked within the building.

Baker argues he locked certain areas of the building not to prevent Compton from reclaiming the heating equipment but to keep out "hippies". The trial judge apparently chose to disbelieve Baker, as was his prerogative as the trier of fact. Although we may have reasonably reached a different conclusion if we were the fact finder, as an appellate tribunal we will not usurp the fact finder's function as judge of the witness' credibility. Baker's mitigation of damages argument fails.

Baker secondly contends the damages awarded Compton on his counterclaim are excessive as not within the scope of the evidence because 1) they do not reflect the supplier's discount to Compton and 2) they include lost profits. Additionally, Compton contends the award of legal fees is exces-

**10.** Our addition shows the total amount to be $23,296.47 rather than $23,296.53.

sive because it exceeds the prayer in the counterclaim.[11]

■ Baker argues, without citation of authority, that the trial court failed to consider in determining damages the evidence Compton received a forty percent (40%) discount on the equipment from his supplier. The trial court quite properly did not consider the discount. The equipment in dispute was the equipment provided under the written agreement which included a sum certain price. It was not, for example, a cost plus ten percent (10%) price, where the contractor's price may be relevant to the question of damages. Compton's price from his supplier is irrelevant to the issue of damages; the relevant price is that between Baker and Compton.

Baker also contends the damages awarded were excessive because "the testimony does not justify an award of lost profits." Appellant's brief at 17. Baker's argument, which he supports by a single authority, is misplaced because the damage award does not include lost profits. Rather, Compton's evidence and the damage award were limited to the goods delivered and services performed under the partially performed written contract and the earlier oral contract. No award was made for the profits, if any, Compton lost as a result of the written contract not being fully performed.

■ Baker's final contention is the attorney's fees awarded Compton upon foreclosure of his lien were excessive, not because they were unsupported by the evidence, but solely because the amount awarded was in excess of the figure pled in the counterclaim. Baker's argument lacks merit. The rhetorical paragraph of the counterclaim containing the statement as to the reasonable value of attorney fees was not admitted in Baker's answer. Further, the counterclaim was not offered in evi-

dence nor was a request made that it be judicially noticed. Therefore, the allegation did nothing more than place the reasonable value of the attorney fees in issue pursuant to which Compton offered evidence.

We are constrained to make a final observation before completing our discussion of the damages awarded to Compton on his counterclaim. In examining the record, we have observed an obvious duplication in Compton's exhibits which has resulted in a mathematical error in the amount of the judgment. The exhibits show the two furnaces, collectively valued at $810, which were installed on the first floor of Baker's building, were included in the damage calculation twice. Record at 414–15. (Defendant's Exhibits L and M). Additionally, the evidence shows the furnace delivered inside Baker's building to the first floor dentist office was one of the furnaces returned by Compton to his supplier for credit. Nevertheless, according to the exhibits, the value of that furnace, $457, is included in the judgment, apparently as a result of an error in calculation. Therefore, under Indiana Rules of Procedure, Appellate Rule 15(N)(3) we remand for correction of these mathematical errors in the judgment.

Upon correction of the errors by reducing the judgment by the amount of $810 and $457, the judgment is affirmed.

SULLIVAN, J., concurs.

MILLER, J. (sitting by designation), concurs.

11. Baker's challenge is to the amount of damages awarded, not to their measure or the method of their calculation. The trial court found Compton entitled under the UCC to the contract price of the portion of the contract represented by the accepted goods. Based upon Compton's proof, the court foreclosed his mechanic's lien for the value of the goods and the ancillary services accepted under the contract. Baker has not challenged the use of reasonable value as the method of determining the amount of the contract price allocable to the portion of the contract represented by the goods accepted by Baker. Therefore, albeit with some reservation, we accept the method.