INSUL–MARK MIDWEST, INC., an Indiana Corporation, and Kor–It Sales, Inc., an Indiana Corporation, Appellants–Plaintiffs Below,

v.

MODERN MATERIALS, INC., Appellee–Defendant Below.

No. 43A04–9104–CV–00101 [1].

Court of Appeals of Indiana, Third District.

June 16, 1992.

---

1. This case was diverted to this office by order of the Chief Judge.

Frank E. Tolbert, John S. Damm, Logansport, for appellants-plaintiffs.

R. Kent Rowe, Rowe, Foley & Huelat, South Bend, for appellee-defendant.

STATON, Judge.

Insul–Mark Midwest, Inc. and Kor–It Sales, Inc. bring this interlocutory appeal from a partial summary judgment for Modern Materials, Inc., raising three issues for our review, which we consolidate into two:

I. Whether the trial court erred in finding that the contract in question was one for services, thus bringing it outside of the purview of Article 2 of the Uniform Commercial Code.

II. Whether the trial court erred in finding that this action was barred by the two-year statute of limitations.

In addition, Modern Materials cross-appeals, raising two issues:

III. Whether the trial court erred in permitting an amendment of the complaint to add a count claiming breach of implied warranty in the performance of a service contract.

IV. Whether the trial court erred in denying Modern Materials' motion for partial summary judgment on the claims for lost profits.

We affirm in part, reverse in part, and remand.

Kor–It Sales, Inc. is in the business of selling roofing supplies to contractors in the Midwest. Insul–Mark Midwest, Inc., sells roofing supplies to distributors, with its major product line consisting of screws or roofing fasteners. For a number of years, the roofing fasteners sold by the two companies did not have any type of protective coating. However, in the mid–1980's, the roofing industry became concerned with the corrosion of the screws when exposed to the elements and began to seek methods of protecting the fasteners to resist corrosion.

In late 1985, Insul–Mark and Kor–It (collectively referred to as "Distributors") spoke with representatives of Modern Materials ("Modern") regarding the coating of their roofing screws with a fluoropolymer-based corrosion-retardant coating denominated "M–Coat". In a letter to Kor–It dated February 6, 1986, Michael Horn, Modern's president, stated, "I am prepared to certify that our Process 300/400 when applied to your metal roof plates and fasteners will exceed 30 Kesternick [sic] cycles with less than 10% red rust." Record, p. 297. The "Kesternich test" is a process whereby metal objects, here roof fasteners, are placed in an environment which simulates acid rain. The objects are placed in a "Kesternich cabinet", where they are exposed to high temperatures and humidities in the presence of sulfur dioxide. The objects are then exposed to the laboratory air for a period of time. A "cycle" consists of twenty-four hours of exposure.

Based upon Modern's assurances, Distributors shipped large quantities of roofing fasteners and plates to Modern, who treated them with the "M–Coat". Modern did not manufacture the coating, which was purchased from another company by the gallon and applied to the fasteners by Modern. The application process included: immersion of the fasteners in a phosphate to clean them; coating of the screws through a "dip-spin" method; baking the fasteners to cure the paint; then, recoating and again baking the screws if necessary to achieve the desired coating thickness.

When the coated fasteners were shipped to Distributors for sale, customers of Distributors began to complain that the fasteners began rusting almost immediately. After attempts to cure the problem were

unsuccessful, some of Distributors' clients began to look elsewhere for their roofing screws and Distributors' sales dropped off dramatically.

Distributors filed suit against Modern on December 19, 1988 alleging breach of express and implied warranties and amended the complaint on June 27, 1990 to add counts of strict liability, negligent misrepresentation, and punitive damages. Modern moved for summary judgment and the trial court granted its motion in part, finding that the action was not covered by the Uniform Commercial Code and that all claims were barred by the two-year statute of limitations. However, the trial court found that Distributors could state a cause of action in contract for breach of implied warranty of quality of services, an action which the trial court conceded has not heretofore been recognized in this state. Both parties appeal.

On an appeal from a summary judgment, we must determine whether the record reveals a genuine issue of material fact and whether the trial court correctly applied the law. *Shuamber v. Henderson* (1991), Ind., 579 N.E.2d 452, 454. Any doubt as to a fact, or an inference to be drawn, is resolved in favor of the nonmoving party. *Id.* Summary judgment will be affirmed if it is sustainable upon any theory supported by the record. *Kolczynski v. Maxton Motors Inc.* (1989), Ind.App., 538 N.E.2d 275, 276, *transfer denied.*

## I.

### Applicability of the Uniform Commercial Code

■ Article 2 of the Uniform Commercial Code applies only to transactions in goods. Ind.Code 26–1–2–102. Generally, "goods" are all things which are movable at the time of identification to the contract for sale. IC 26–1–2–105. Thus, the resolution of this question turns upon whether there was a transaction in goods.

The transaction here involved the application of coating to fasteners and plates provided by the Distributors. While the coating applied to the fasteners matches the description of goods, the complicated cleaning, coating, curing and recoating process can only be characterized as a service. As a result, this transaction is a mixed transaction involving both goods and services.

■ There is a split of authority in Indiana as to the proper analysis to be applied in determining whether a mixed transaction falls under the purview of Article 2. Our Fourth District has adopted a bifurcated analysis, stating that the goods portion of the transaction is governed by Article 2, while the services portion of the transaction is governed by the common law. *Stephenson v. Frazier* (1980), Ind. App., 399 N.E.2d 794, *transfer denied* 425 N.E.2d 73; *Peltz Const. Co. v. Dunham* (1982), Ind.App., 436 N.E.2d 892; *Data Processing v. L.H. Smith Oil Corp.* (1986), Ind.App., 492 N.E.2d 314, *reh'g denied* 493 N.E.2d 1272. Our Second District declined to follow this approach in *Baker v. Compton* (1983), Ind.App., 455 N.E.2d 382:

> We deem the uniformity and clarity sought to be promoted by the UCC are better served by determining the predominant thrust of a mixed goods and services contract. Where, as here, the predominant thrust of the contract is the sale of goods, the purposes of the UCC are furthered by treating the contract as falling entirely within the jurisdiction of the UCC rather than dividing it into service and goods components.

*Id.* at 387.

We believe the better view is that espoused by our Second District. As Judge Shields noted in *Baker, supra,* the bifurcated approach adopted in *Stephenson, supra* has been criticized by at least one commentator as unworkable in some situations:

> This analysis is logical, yet it may be difficult to apply in cases where the contract cannot be easily divided, such as a contract for laying an asphalt driveway. Also, this approach could lead to difficulties where the substantive issue is not related to performance, but is related to creation of the agreement, such as a question concerning the Statute of Frauds. For example, a court could find

that the services component may be enforced, but the goods component could not be enforced because of a failure to satisfy the writing requirement of UCC 2–201(1). Partial enforcement of the contract could result in prejudice to the seller who may have offered services at a lower price because the goods were being sold as part of the same transaction.

Bepko, *Contracts, Commercial Law, and Consumer Law,* 14 Ind.L.Rev. 223, 224 (1981) (footnotes omitted).[1] Moreover, the vast majority of jurisdictions which have addressed the question have adopted the "predominant thrust" test. *See* Annotation, *Applicability of UCC Article 2 to Mixed Contracts for Sale of Goods and Services,* 5 A.L.R.4th 501 (1981).

■ We turn to the facts in this case. Modern purchased the coating material from a supplier. Modern did not manufacture the coating, though it would re-mix it if the customer required. Application of the coating was a multi-stage process. Fasteners were sent to Modern by Distributors, and were inspected upon arrival to make certain they were not damaged in transport. The screws were then sent to a cleaning room, where they were alkaline washed and rinsed. Chrome sealer was applied and the fasteners were dried and sent to the coating department. Batches of the screws were placed in a basket and lowered into a tank of Xylan paint. The screws were then removed and the basket was spun at high revolutions to remove excess paint. The batch of fasteners was placed on a conveyer belt and the coating was oven cured at a temperature of 400 degrees. Chemical "wipe tests" were periodically performed to make sure that the paint cured, and the thickness of the paint was measured by an electronic thickness gauge to see if the paint had been applied to the proper thickness. If the paint was

not thick enough, the screws were again dipped, spun, and baked. Generally, two coats were necessary. The entire coating process took about four to six hours per batch. The screws were then repackaged for the return to Distributors.

This case provides a somewhat unique fact situation—materials owned by the buyer are modified by the seller and returned to the buyer with some physical change to the materials. While we were unable to find a case directly on point, there are a number of cases in which similar factual situations were presented. *See, e.g., Gentile v. MacGregor Mfg. Co.* (1985), 201 N.J.Super. 612, 493 A.2d 647 (football helmet reconditioners; process sometimes required the installation of replacement parts); *Manes Organ. v. Standard Dyeing & Finishing Co.* (S.D.N.Y.1979), 472 F.Supp. 687, n. 3 (processor dyed and finished cloth provided by buyer); *Wells v. 10–X Mfg. Co.* (6th Cir.1979), 609 F.2d 248 (shirtmaker made shirts, all materials except thread provided by buyer); *OMAC, Inc. v. Southwestern Mach. and Tool* (1988), 189 Ga.App. 42, 374 S.E.2d 829 (manufacturer manufactured and sold parts made from materials provided by OMAC). In each of these cases, the contract was found to be predominantly for services, and Article 2 of the UCC was held inapplicable to the situation. We reach the same result here. We hold that this transaction was predominantly a transaction for services, and the common law is applicable to the situation.

Distributors argue, however, that there is a genuine issue of material fact precluding summary judgment as to whether the contract was for goods. They note that the purchase orders request Xylan coating, Modern gave oral warranties as to the performance of the coating, Modern's invoices

1. Interestingly, the difficulty of applying the bifurcated analysis in certain situations is illustrated by *Data Processing, supra* (contract to write software), and *Peltz, supra* (contract to install drainage system). There, each of the cases involved mixed transactions—both goods and services. However, the "goods" component was not easily severable from the "services" component. The courts, while professing to apply the bifurcated analysis, applied the common law to the entire transaction, rather than applying the UCC to the "goods" part of the transaction. The effect was a *de facto* application of the predominant thrust doctrine.

to the Distributors charged by the pound,[2] and the fact that the coating was necessary to meet the Kesternich test. They also quote the following language from *Baker, supra:*

> The predominant thrust of a mixed contract is a factual question determined by a review of the contract and the circumstances surrounding the formation and contemplated performance of the contract.

*Id.* at 386.

■ We agree that the question whether a contract is predominantly for goods or for services turns upon the facts of the particular case. However, that does not mean that the issue can never be determined by summary judgment. If there is no genuine issue of material fact, summary judgment is appropriate. Here, Distributors' arguments raise no issue of fact; they only dispute the law as applied to the facts. Simply stated, even drawing all inferences in favor of Distributors, the circumstances surrounding the formation and performance of the contract establish that Modern was predominantly performing a service for Distributors, to which the coating was merely incidental. The trial court properly determined that the UCC is inapplicable to this case.

## II.

### *Statute of Limitations*

Distributors argue that the trial court erred in dismissing the warranty claim in their complaint, as it was governed by either the four-year statute of limitations contained in the UCC, Indiana Code 26–1–2–725, or the six-year statute for contracts not in writing found in Indiana Code 34–1–2–1. Modern replies that the trial court properly found the action to be barred by the two-year statute of limitations in Indiana Code 34–1–2–2. As we have determined above that the UCC is not applicable to this situation, we address the remaining issue of whether the two-year or six-year statute applies.

■ In determining the applicability of statutes of limitation, we look at the nature or substance of the cause of action, rather than the form in which it was pleaded. *Shideler v. Dwyer* (1981), 275 Ind. 270, 417 N.E.2d 281, 285. The substance of the cause of action may be ascertained by an inquiry into the nature of the alleged harm. *Whitehouse v. Quinn* (1985), Ind., 477 N.E.2d 270, 274. Distributors argue that the nature of the action is for breach of contractual warranties. Modern argues that in substance, this action is an action for injury to property. Modern supports its argument by alleging that the alleged harm is "an action to recover personal property damage, whether that be damage to the roofing fasteners themselves or whether it be in the form of plaintiffs' business, good will or reputation." Appellee/Cross–Appellant's brief, p. 25.

■ Distributors' second amended complaint states:

\* \* \* \* \* \*

5. The Plaintiffs entered into an agreement with the Defendant for the Defendant to coat large quantities of screws manufactured for Kor–It Sales, Inc. and to be marketed by Insul–Mark Midwest, Inc., for specific use in outside applications, particularly in fastening various types of roofing materials for class 1 roof covers so as to exceed the proposed corrosion standard 4470 of Factory Mutual Research which required resistance to 15 cycles of exposure in the Kesternich Cabinet with less than 15% of the surface area rusted.

6. That the screws coated by Modern Materials, Inc. and returned to Kor–It Sales, Inc., failed to comply with the expressed and implied warranties as well as the warranties of fitness for their particular purpose and the warranty of merchantability.

7. That Defendant breached its contract with the Plaintiffs.

---

2. This contention is somewhat misleading. The invoices charged by the pound of *fasteners,* not per pound of coating.

8. That almost immediately after the screws coated by Modern Materials, Inc., were sold by Plaintiffs, the failure of Defendant's coating thereon became immediately apparent and the Defendant was notified.

9. That Defendant represented to Plaintiffs that it would correct the deficiencies which opportunity the Plaintiffs afforded the Defendant.

10. That the Defendant, Modern Materials, Inc., failed to cure the defects or the breach of their contract and as a result the Plaintiffs, Kor–It Sales, Inc., and Insul–Mark Midwest, Inc., suffered the following damages:

a. Physical damage to the screws themselves including, but not limited to rust, rendering them inadequate and unfit for the purpose for which they were intended.

b. Lost sales.

c. Lost advertising costs.

d. Extra shipping costs.

e. Extra costs in connection with recoating.

f. Costs of labor to re-sort and re-box the materials.

g. Damage to its business reputation and lost future sales.

h. Claims for damages caused by the failure of the Defendant's defective coating.

i. Other incidental and consequential damages.

Record, 58–59. It is clear from the language of the complaint that Distributors seek to recover from damages sustained as a result of Modern's alleged failure to comply with the terms of the service contract. Stated otherwise, it is Modern's failure to conform the product to its written and oral assurances, rather than Modern's noncompliance with a standard of care imposed by law, which is the gravamen of Distributors' complaint. We therefore hold that the six-year statute of limitations for oral contracts, and not the two-year statute, applies to this action.

Distributors first contacted Modern in 1985, filed their complaint on December 19, 1988, and amended it on June 27, 1990.

Clearly, the action was brought within the statute. The trial court erred in dismissing Distributors' warranty claim on the grounds that it was not brought within the statute of limitations.

### III.

*Implied Warranties in Service Contracts*

■ Modern argues on cross-appeal that the trial court erred in finding that Distributors could maintain its action based upon breach of implied warranty of quality. While Distributors acknowledge that no Indiana case has specifically recognized this cause of action, they invite us to break new ground in this area.

Courts in a number of jurisdictions have recognized an implied warranty in service contracts. These courts have generally seen fit to imply a warranty where the parties are situated as follows: 1) one party expressly or impliedly holds himself out as competent to undertake the contract; and the other 2) has no particular expertise in the kind of work contemplated; (3) furnishes no plans, designs, specifications, blueprints, etc.; and (4) tacitly or specifically indicates his reliance on the experience and skill of the contractor, after making known to him the specific purposes for which the service is to be performed. *See, e.g., Robertson Lumber Co. v. Stephen Farmers Cooperative Elevator Co.* (1966), 274 Minn. 17, 143 N.W.2d 622; 626; *Air Heaters, Inc. v. Johnson Elec. Inc.* (1977), N.D., 258 N.W.2d 649, 653; *Semler v. Knowling* (1982), Iowa, 325 N.W.2d 395, 399; *cf. Melody Home Mfg. Co. v. Barnes* (1987), Tex., 741 S.W.2d 349. A number of public policy reasons have been advanced in favor of the recognition of implied warranties in service transactions. *See, e.g., Melody Home, supra* at 353–354. In addition, courts and commentators have often noted the lack of a reasoned basis upon which to extend implied warranties to transactions in goods under the Uniform Commercial Code and yet refuse to recognize similar warranties in transactions in

services.[3] *See, e.g.,* Farnsworth, *Implied Warranties of Quality in Non-Sales Cases,* 57 Colum.L.Rev. 653 (1957); Note, *The Application of Implied Warranties to Predominantly "Service" Transactions,* 31 Ohio St.L.J. 580 (1970). The public policy reasons advanced for adoption of implied warranties in service transactions are most compelling in the case of consumer service transactions, where the parties are not on an equal footing. *See, e.g.,* Greenfield, *Consumer Protection in Service Transactions—Implied Warranties and Strict Liability in Tort,* 1974 Utah L.Rev. 661 (1974); Norman, *Consumer Service Transactions, Implied Warranty and a Mandate for Realistic Reform,* 11 Loy. U.L.J. 405 (1980).

■ The parties here were both corporations dealing at arm's length. Each was free to negotiate the terms of the contract as it saw fit, and to secure assurances of performance, guarantees, warranties, etc. We do not deem it necessary to extend the protection of implied warranties to service transactions between merchants dealing at arm's length. Accordingly, we hold that under the facts of this case we will not imply a warranty of quality as a term of this service contract. We leave for another day the question whether implied warranties are appropriate in consumer service transactions.

## IV.

### *Lost Profits*

In its motion for summary judgment, Modern contended that Distributors could not recover damages for lost profits, or, as phrased in the complaint, "damages to its business reputation and lost future sales." Record, p. 59. Specifically, Modern pointed to the testimony of Distributors' economist regarding loss of future sales to customers lost as a result of the rusted screws and loss of future sales to customers who would have sought to purchase screws from Distributors had the screws not been defective. Modern argued that such damages are speculative and therefore not recoverable. In ruling on Modern's motion for summary judgment, the trial court did not specifically address this issue, although it stated that Distributors could recover "expectation damages" on their remaining claims. Record, pp. 129–130. Modern contends here that the trial court erred in failing to grant summary judgment on the issue of lost profits.

■ A party injured by a breach of contract may receive, *inter alia,* consequential damages. *Clark's Pork Farms v. Sand Livestock Sys.* (1990), Ind.App., 563 N.E.2d 1292, 1298. Consequential damages include those that may reasonably be considered to have arisen naturally from the breach or those that may reasonably have been in contemplation of the parties as a probable result of breach of the contract at the time it was entered. *Id.* Consequential damages may include lost profits, providing the evidence is sufficient to allow the trier of fact to estimate the amount with a reasonable degree of certainty and exactness. *Id.* A jury may not award damages on the mere basis of conjecture and speculation. *Farm Bureau Mut. Ins. Co. v. Dercach* (1983), Ind.App., 450 N.E.2d 537, 540, *transfer denied.* However, lost profits need not be proved

---

**3.** In fact, the Uniform Commercial Code itself recognizes that extension of implied warranties to other than the sale of goods may be appropriate. Comment 2 to § 2–313 states:

"Although this section is limited in its scope and direct purpose to warranties made by the seller to the buyer as part of a contract for sale, the warranty sections of this Article are not designed in any way to disturb those lines of case law growth which have recognized that warranties need not be confined either to sales contracts or to the direct parties to such a contract. They may arise in other appropriate circumstances such as in the case of bailments for hire, whether such bailment is itself the main contract or is merely a supplying of containers under a contract for the sale of their contents. The provisions of Section 2–318 on third party beneficiaries expressly recognize this case law development within one particular area. Beyond that, the matter is left to the case law with the intention that the policies of this Act may offer useful guidance in dealing with further cases as they arise." Indiana has recognized an implied warranty of habitability in contracts for the construction of homes. *Theis v. Heuer* (1972), 264 Ind. 1, 280 N.E.2d 300.

with mathematical certainty. *Id.* at 541. Lost profits are not uncertain where there is testimony which, while not sufficient to put the amount beyond doubt, is sufficient to enable the jury to make a fair and reasonable finding as to the proper damages. *Jerry Alderman Ford Sales, Inc. v. Bailey* (1972), 154 Ind.App. 632, 291 N.E.2d 92, 106, *reh'g denied* (1973), 154 Ind.App. 632, 294 N.E.2d 617, *transfer denied.* On the other hand, it is wholly improper for the trier of fact to project past profits indefinitely into the future without evidence that the projection was at least reasonably certain. *Id.,* 291 N.E.2d at 107. In addition, one may not recover future profits for loss of face in the industry or loss of goodwill in an action for breach of contract. *Ind. & Mich. Elec. Co. v. Terre Haute Indus., Inc.* (1987), Ind.App., 507 N.E.2d 588, 606–607, *transfer denied* 525 N.E.2d 1247.

▇▇ Turning to the facts of the present case, it is clear that under Indiana law, Distributors could not recover lost profits from damage to their business reputation due to the allegedly defective screws. *Ind. & Mich. Elec., supra.* Thus, the trial court should have granted Modern's motion for partial summary judgment with respect to future lost profits for future customers and for customers not affected by the transaction between Modern and Distributors.

▇▇ On the other hand, a more accurate picture of calculating damages is presented by customers who were expecting delivery of treated screws and fasteners. Here, the degree of certainty narrows when calculating loss of future profit and of future business. These calculated damages may be recoverable as long as the loss was reasonably in contemplation of the parties at the outset of contractual negotiations, and the damages can be ascertained with a reasonable degree of certainty.[4]

▇▇ Distributors introduced testimony which indicated that Modern knew the screws were being coated for sale to a third party. In addition, Distributors introduced the testimony of an economist as to lost profits. The economist, as an expert witness, testified as to Distributors' loss of future sales to customers. Modern alleges that the economist's testimony was inherently speculative and therefore it was entitled to summary judgment on this issue. While it is true that the economist based his testimony on a number of assumptions, we can not say as a matter of law that the evidence on future lost profits is too speculative to be submitted to the jury. This type of testimony is often characterized by some degree of uncertainty:

> Profits that would have been made but for the defendant's breach are frequently held not to be too uncertain or speculative for proof, when they are the profits that would have resulted immediately from the performance of the contract broken. The plaintiff is less likely to be permitted to show that the breach has caused him to be unable to make or to perform other contracts collateral to the one broken, contracts to which the defendant was not himself a party. The profits from these contracts may be regarded as too remote or too speculative; they will not be so regarded if the defendant had reason to foresee them.

\* \* \* \* \* \*

Assuming, therefore, that profits prevented may be considered in measuring the damages, are profits to be divided into classes and kinds? Does the term "speculative profits" express one of these classes, differing in nature from non-speculative profits? Do "uncertain" profits differ in kind from "certain" profits? The answer is assuredly, No. There is little that can be regarded as certain, especially with respect to what

4. Naturally, assuming liability is proved, Distributors may recover damages for the lost profits from broken transactions between Distributors and their customers for the defective screws. Modern does not challenge the recoverability of damages for losses sustained due to Distributors' inability to perform its contractual

obligations with third parties as a result of the substandard roofing fasteners. It challenges only the recoverability of "lost profits from anticipated sales to [Distributors' customers] extending well beyond the scope of actual purchase order commitments...." Appellee's Brief, p. 37.

would have happened if the march of events had been other than it in fact has been. Neither court nor jury is required to attain "certainty" in awarding damages; and this is just as true with respect to "value" as with respect to "profits". Therefore, the term "speculative and uncertain profits" is not really a classification of profits, but is instead a characterization of the evidence that is introduced to prove that they would have been made if the defendant had not committed a breach of contract. The law requires that this evidence shall not be so meager or uncertain as to afford no reasonable basis for inference, leaving the damages to be determined by sympathy and feelings alone. The amount of evidence required and the degree of its strength as a basis of inference varies with circumstances. A greater amount and a higher degree are required in those cases in which it is usually possible to produce it than in cases where it is usually impossible or difficult and the defendant had reason to know it.

Corbin, *Corbin on Contracts* § 1022 at pp. 138–140 (1964) (footnotes omitted). Thus, the fact that the evidence on damages is not mathematically certain should not mandate the exclusion of such evidence as a matter of law. "The trial court has a large amount of discretion in determining whether to submit the question of profits to the jury; and when it is so submitted, the jury will also have a large amount of discretion in determining the amount of its verdict." *Id.* at 145–146. Accordingly, we direct the entry of summary judgment in favor of Modern on damages for future lost profits for those customers of Distributors which had not contracted to receive the allegedly defective screws; i.e. Distributors are not entitled to lost profits due to damage to their business reputation. However, Modern is not entitled to summary judgment on the issue of future lost profits from Distributors' customers who contracted to receive the screws and later discontinued business with Distributors because Distributors failed to provide a satisfactory product.

We affirm in part, reverse in part and remand for proceedings consistent with this opinion.

GARRARD and BAKER, JJ., concur.