INSUL–MARK MIDWEST, INC., an Indiana Corporation, and Kor–It Sales, Inc., an Indiana Corporation, Appellants (Plaintiffs Below),

v.

MODERN MATERIALS, INC., Appellees (Defendants Below).

No. 43S04–9304–CV–453.

Supreme Court of Indiana.

April 20, 1993.

Frank E. Tolbert, John S. Damm, Logansport, for appellants.

R. Kent Rowe, Edmond W. Foley, South Bend, for appellees.

SHEPARD, Chief Justice.

The question is how to decide whether to apply the sales section of the Uniform Commercial Code to a transaction involving both goods and services. We grant transfer to resolve conflicting authority in the Court of Appeals.

## Procedural History

This case arises from a transaction between Kor–It Sales, Inc. and Modern Materials, Inc. Kor–It sent roofing fasteners to Modern Materials for application of fluorocarbon coating to increase the rust resistance of its screws. The commercial relationship between Kor–It and Modern Materials fell apart, however, when some of the coated screws failed to meet certain rust resistance standards as guaranteed by Modern Materials.

On December 19, 1988, Kor–It and its marketing arm, Insul–Mark Midwest, Inc., filed suit against Modern Materials, alleging that rust defects in some of the screws were caused by Modern Materials' deficient coating application. The second amended complaint contained four counts: a claim for breach of express and implied warranties, breach of contract, and failure to cure deficiencies as promised (Count I); a strict liability products claim (Count II);[1] a misrepresentation claim for damages and restitution for plaintiffs' detrimental reliance on Modern Materials' false and deceptive representations regarding the quality and nature of the treatment process (Count III); and a punitive damages claim alleging willful and wanton conduct (Count IV). Modern Materials filed a counterclaim against Kor–It for $6,056.07 on account for labor and materials furnished to Kor–It.

Modern Materials moved for summary judgment on the ground that plaintiffs' whole cause of action is barred by the two-year statute of limitations for injuries to person or character and to personal property. It also moved for summary judgment

on the lost profits claim, the punitive damages claim, and the implied warranty claims. On the implied warranty claims, Modern Materials based its motion on the absence of privity between Insul–Mark and Modern Materials, and on the inapplicability of U.C.C. implied warranties because the transactions between the parties were service contracts not covered by the U.C.C.

The trial court held that plaintiffs' action was a claim for damage to personal property and thus barred by the two-year statute of limitations. It agreed with Modern Materials that the U.C.C. does not apply to this case. It held that plaintiffs might still assert a contract claim, including one for implied warranty of performance.[2]

The trial court certified its order for interlocutory appeal. The Indiana Court of Appeals accepted the appeal. It affirmed the trial court's judgment in part, reversed it in part, and remanded for further proceedings. *Insul–Mark Midwest v. Modern Materials* (1992), Ind.App., 594 N.E.2d 459.

## Facts

Kor–It and Insul–Mark, owned by the same family, are businesses principally engaged in the sale of roofing fasteners for single-ply roofing systems. Kor–It supplies contractors and industrial consumers with roofing fasteners and other products such as abrasives, cutting tools, power tools and bolts and anchors. Kor–It's principal sales area is Northern Indiana. Insul–Mark is the marketing arm of Kor–It, distributing Kor–It's roofing fasteners nationwide to other distributors, manufacturers and contractors. During the relationship between Kor–It and Modern Materials, screws coated by Modern Materials comprised Insul–Mark's sole product line.

Modern Materials' business is coating the products of its customers. It receives a customer's parts, processes them, and then returns them to the customer. In doing so, Modern Materials employs over two hun-

---

1. Plaintiffs removed this issue from contention prior to the trial court order on summary judgment.

2. It also held: (1) that there was an issue of fact concerning privity and damages and (2) that the treble damages claim was barred by the statute of limitations. These decisions are not at issue in this appeal.

dred coating processes ranging from liquid to powder coatings.

In late 1985, Duro–Last, a national manufacturer of single-ply roofing systems and Kor–It's largest purchaser of screws, asked Kor–It to begin using a fluorocarbon-coated screw. Kor–It, through Insul–Mark as distributor, was Duro–Last's sole source of roofing fasteners, supplying Duro–Last's requirements for screws on a weekly basis.

Duro–Last did not specify what coating Kor–It should apply to the screws, but specified the performance required of the screws. It demanded that the screws meet a specific standard of rust resistance as measured by an industry test performed by a machine called the "Kesternich Cabinet." Specifically, it wanted Kor–It's screws after coating to pass thirty cycles in the Kesternich Cabinet with less than 10% red rust.[3]

In fall 1985, Kor–It contacted Modern Materials about the possibility of applying a fluorocarbon coating to large volumes of Kor–It's screws. Kor–It selected Modern Materials after Michael Horn, Modern Materials' president, certified that screws with its "Xylan 5251" coating would meet the Kesternich Cabinet measure of thirty cycles with less than 10% red rust. In a letter dated February 6, 1986, Horn told Kor–It: "I am prepared to certify that our Process 300/400 when applied to your metal roof plates and fasteners will exceed 30 Kesternick [sic] cycles with less than 10% red rust." Kor–It and Insul–Mark then told their customers that their roofing fasteners would pass a thirty cycle Kesternich test with less than 10% red rust.

Modern Materials obtained its Xylan coating from Whitford Corporation. Whitford charged Modern Materials a unit price per gallon of Xylan. Whitford also supplied Modern Materials with instructions for the coating. Xylan 5251 coating was a solvent-based liquid coating which could be applied through dip-spin or conventional air spray techniques.

Modern Materials was Kor–It's sole coater from late 1985 until 1987. Modern Materials did not provide the screws to be coated for Kor–It; rather, Kor–It or its supplier sent the screws to Modern Materials for coating. Kor–It delivered large quantities of its screws to Modern Materials for coating in the future upon Kor–It's instruction. Kor–It informed Modern Materials at the outset of their relationship that it expected to send a total of 200,000 to 300,000 screws for coating. Kor–It shipped one container (84,000 pounds) of screws to Modern Materials in mid-April 1986, and a second in mid-May 1986. Eventually, Modern Materials coated three containers of Kor–It screws.

Modern Materials coated Kor–It screws when it received a phone order directing it to do so. A representative from Kor–It would call Modern Materials with an order to coat a certain amount of screws of a given length. The transactions between Modern Materials and Kor–It were not recorded as purchase orders, with delivery dates, as Kor–It was not purchasing anything from Modern Materials. Rather, Modern Materials' invoices to Kor–It were in the form of work orders, charging Kor–It for the coating by the pound and length of screws coated. (Record at 208); *see also* (Record at 391) (telling Kor–It that screws over 3.75 inches long cost Modern Materials 40 cents to coat).

After receiving a coating order from Kor–It, Modern Materials would coat the specified screws in batches according to their length. Application of the coating to the screws involved a multi-step process. First, Kor–It inspected the screws for physical flaws, discarding those which were broken or bent. The remaining screws were then transported to a cleaning room, where they were alkaline washed, rinsed and dried. The screws were then placed in the basket of the dip-spin machine for coating.

---

**3.** In the cabinet, screws are tested for the effects of acid rain on their coating, with the amount of rust measured. (Record at 167). Screws are placed inside the cabinet and exposed to sulphur dioxide for eight-hour intervals. (Record at 169). Meeting "thirty cycles" in the cabinet with "less than 10% red rust" means that after thirty 24–hour cycles in the cabinet, less than 10% of a screw's total surface area contains red rust. (*Id.*).

The basket, with screws, was then dunked into the coating material, while the spinning of the machine discarded excess coating. Finally, the screws were placed on trays and oven-cured on a belt conveyor. The adequacy of the curing was checked through a wipe test. The screws were adequately cured if the coating did not come off after they were swabbed and wiped.[4]

In addition to coating Kor–It's screws, Modern Materials periodically tested their rust resistance through either salt spray testing or the Kesternich test. Testing the coating was apparently one of Modern Materials' responsibilities in its relationship with Kor–It.

Kor–It terminated Modern Materials as its coater in spring 1987 after receiving numerous customer complaints about flaking and premature rusting of its coated screws. In early 1986, some customers complained that the coating on Kor–It screws was flaking off. One seller of Insul–Mark screws determined after looking at the screws under a microscope that the coating job was shoddy. In his opinion, Modern Materials' coating was not adhering properly.

In June 1986, Kor–It began to receive complaints about the poor rust-resistance of the screws. Customers complained that such screws became rust covered after being left outdoors overnight. After Kor–It notified Modern Materials of the rust problems, Horn told Kor–It that his company must have forgotten to perform part of the coating process. He instructed Kor–It to return the problem screws for re-coating. Modern Materials charged Kor–It another 15 cents per pound for recoating. Modern Materials' re-coating did not eliminate the rust problems; customers similarly found the re-coated screws unsatisfactory.

Duro–Last, Insul–Mark's largest customer, encountered rust problems with the coated screws, and returned a total of 12–15 tons of screws to Insul–Mark for recoat-ing. After re-coating did not solve the rust problems, Duro–Last terminated its relationship with Insul–Mark in mid–1986 and sought another supplier of roofing fasteners. In Kor–It President Peter Bernacchi's opinion, Duro–Last lost confidence in Insul–Mark and Modern Materials' coating and its purchases from Insul–Mark dwindled to nothing. Many other customers terminated Kor–It and Insul–Mark as their suppliers. Through Duro–Last's national market, word of the companies' fastener problems presumably spread nationwide. The companies attribute lost screw sales after 1986 and diminished business reputation directly to the failure of Modern Materials' coating.

Kor–It was forced to cancel two containers of screws it had ordered from its supplier. As a result, it alleges, it lost its contractual relationship with the supplier. In addition, both companies allege that the defective coating caused them promotional losses, costs of re-coating, losses from credit memoranda, costs of certification tests, repackaging, labor and freight, and loss of screws. One of Insul–Mark's customers also made claims in excess of $19,000 on the faulty screws.

### *Applicability of the U.C.C.*

■ The Sales chapter of the Indiana U.C.C., Ind.Code § 26–1–2, "applies to transactions in goods," unless the context otherwise requires. Ind.Code Ann. § 26–1–2–102 (West Supp.1992). The code defines goods as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale." Ind.Code Ann. § 26–1–2–105(1) (West Supp.1992). An agreement solely for the performance of services is not subject to the sales provisions of the U.C.C. *Wells v. 10–X Mfg. Co.,* 609 F.2d 248 (6th Cir.1979).

Many modern commercial transactions cannot be classified as transactions purely for goods or for services, but are "mixed,"

---

**4.** These were the steps used to coat screws which were zinc-plated. Screws which began the process without zinc-plating went through additional processing steps. Such screws were subjected to phosphate and chrome rinse baths, and, when necessary, an acid pickle and grit blasting or tumble blasting.

involving both goods and services. *E.g.*, *Bonebrake v. Cox*, 499 F.2d 951, 960 (8th Cir.1974) (cases involving non-divisible mixed contracts "are legion"). The coating transactions in this case between Kor–It[5] and Modern Materials are indeed "mixed," involving both goods (the coating material) and services (the application of coating). Kor–It did not purchase the coating material directly from Modern Materials, but provided Modern Materials its screws for application of coating (a service).

Given that the transaction is "mixed," we must determine whether it falls within the U.C.C., or falls outside of the code and is thus governed by the common law. The Indiana Court of Appeals has formulated and applied tests for determining the applicability of the U.C.C. to mixed transactions. In *Baker v. Compton* (1983), Ind.App., 455 N.E.2d 382, the Second District adopted the "predominant thrust" test. The Third District also applied the predominant thrust test in this case to conclude that the code does not apply to the transactions between Kor–It and Modern Materials because the thrust of the transactions was predominately for services. *Insul–Mark*, 594 N.E.2d at 462.

■ Under the predominant thrust test, the applicability of the U.C.C. to a mixed transaction is determined by considering whether the transaction's "predominant factor, [its] thrust, [its] purpose, reasonably stated, is the rendition of service, with goods incidentally involved (e.g., contract with artist for painting) or is a transaction of sale, with labor incidentally involved (e.g., installation of a water heater in a bathroom)." *Bonebrake*, 499 F.2d at 960 (footnotes omitted).

In contrast, the Fourth District has adopted a bifurcation approach for determining the applicability of the U.C.C. in mixed transactions. *Data Processing Serv. v. L.H. Smith Oil Corp.* (1986), Ind. App., 492 N.E.2d 314, 318, *on rehearing*, 493 N.E.2d 1272; *Stephenson v. Frazier* (1980), Ind.App., 399 N.E.2d 794. Under that approach, the portion of a transaction involving goods is governed by code principles, while those parts relating to the provision of services are controlled by the common law. *Id.* at 797.

We conclude that the predominant thrust test is the best and most workable approach for determining the applicability of the U.C.C. to mixed transactions.[6] Under the predominate thrust test, courts look to the agreement between the parties to determine their understanding about the predominant purpose of the contract. In focusing on the goals of the contracting parties, the predominant thrust approach preserves parties' expectations regarding their agreement.

The bifurcation approach seems less sensitive to parties' expectations. Rather, the effect of such approach is to break an agreement into two contracts, with one governed by the U.C.C. and one by the common law. Such an outcome in some cases might drastically alter the legal effect of the agreement as intended by the parties. *See* Gerald L. Bepko, *VI. Contracts, Commercial Law, and Consumer Law,* 14 Ind.L.Rev. 223, 224 (1981). Dean (now Chancellor) Bepko suggests that bifurcation could lead to difficulties when the substantive issue at trial is not related to performance, but is related to the enforceability of the agreement. *Id.* For example, when the issue is the Statute of Frauds, bifurcating an oral goods/services contract might lead to enforcement of only the services portion of the contract, with the goods portion held unenforceable. *Id.* Such a result would defeat the intentions of parties who sought to create a unitary contract. *Id.*

Moreover, the bifurcation test would be difficult to apply in cases where the goods and service components of a transaction

---

**5.** Throughout this discussion we use "Kor–It" as a short-hand reference to Kor–It and Insul–Mark.

**6.** We join a substantial number of states which have adopted the predominant thrust test. *See* *generally* Sonja A. Soehnel, Annotation, *Applicability of UCC Article 2 to Mixed Contracts for Sale of Goods and Services,* 5 A.L.R. 4th 501 (1981 & Supp.1992).

are essentially intertwined. *Id.* Bifurcation would be unworkable where an agreement is not easily divisible, or where the problem with the transaction is not easily traced to solely the goods or services portion.[7]

■ To determine whether the predominant thrust of a mixed contract is to provide services or goods, one first looks to the language of the contract, *see Wells,* 609 F.2d at 255, in light of the situation of the parties and the surrounding circumstances. *Standard Structural Steel Co. v. Debron Corp.,* 515 F.Supp. 803, 808 (D.Conn.1980), *aff'd,* 657 F.2d 265 (2d Cir.1981). Specifically, one looks to the terms describing the performance required of the parties, and the words used to describe the relationship between the parties. *See id.* at 808–10.

Beyond the contractual terms themselves, one looks to the circumstances of the parties, and the primary reason they entered into the contract. *See Bonebrake,* 499 F.2d at 957 (primary purpose of mixed contract was to replace goods). One also considers the final product the purchaser bargained to receive, and whether it may be described as a good or a service.

Finally, one examines the costs involved for the goods and services, and whether the purchaser was charged only for a good, or a price based on both goods and services. If the cost of the goods is but a small portion of the overall contract price, such fact would increase the likelihood that the services portion predominates. *See Baker,* 455 N.E.2d at 386.

### Is This Case Goods or Services?

Kor–It and Insul–Mark contend that the undisputed facts establish, or at least create a genuine issue of material fact, that provision of the coating material, a good, was the predominant thrust of the contract. They argue that this goods aspect predominates over the services aspect, which was only a necessary part of the procurement of coating.

Modern Materials argues that the Sales article of the U.C.C. does not apply in this case because its contract with Kor–It and Insul–Mark was predominantly for services. It notes that Kor–It President Peter Bernacchi himself stated that the purpose of the transaction was to have Modern Materials perform a service on his company's product. Modern Materials contends that it was the complicated coating process that was purchased, and not the coating material used to coat the screws.

■ We do not begin our analysis with a presumption that the parties' transaction was predominantly for goods and thus governed by the U.C.C. We reject Kor–It and Insul–Mark's invitation that we err on the side of finding the transaction to be predominantly for goods. Kor–It and Insul–Mark, the parties seeking the benefit of the code, bear the burden of establishing that the thrust of the transaction was predominantly for goods and only incidentally for services. *See Air Heaters v. Johnson Electric,* 258 N.W.2d 649 (N.D.1977).

■ We hold that the thrust of the agreement between Kor–It and Modern Materials was predominantly for performance of a service. Kor–It's main purpose in entering into the coating transaction was to improve the rust-resistance of its screws. Its specifications regarding rust-resistance related to the quality of its screws after application of a fluorocarbon coating material, and not to the quality of the coating material by itself. Kor–It bargained for a service which would improve the durability of its screws. It hired Modern Materials based on the company's promise that the "Process 300/400 *when applied* to your metal … fasteners will exceed 30 Kesternick [sic] cycles with less than 10% red rust." (Record at 297) (emphasis added).

Kor–It's president described what he wanted: "I had a service that I needed to be performed on my product, and we mutually agreed … [Modern Materials] could do the service for me." (Record at 888). Similarly, Modern Materials' correspon-

---

**7.** In adopting the predominant thrust test, we do not rule out the possibility that in some situa-

tions bifurcation might be used as a secondary approach for determining the applicable law.

dence with Kor–It referred to its "process" and its "performance" in producing the process. (Record at 398, 810, 892, 1199).

Kor–It neither specified nor involved itself in the decision-making regarding which coating material Modern Materials would apply to the screws. (Record at 917–18, 1114, 1259, 1274–75). The record demonstrates that Kor–It's only concern was with the finished product (Record at 918–19), i.e., the finished, rust-proofed, screws.

The performance Kor–It contracted to obtain was the transformation of its screws from a non-coated form to a coated form with enhanced rust-resistance. Modern Materials' complex multi-step application process was the crucial element completing this transformation. The transfer of the coating material, a good, in the process was incidental to the larger service.

Particularly revealing is the pricing method Modern Materials used for the coating. Kor–It was charged not by the gallon for the coating, as Modern Materials was charged by its coating supplier. Instead, it was charged by the pound of screws coated. If the coating material itself were the predominant thrust of the contract, presumably Kor–It would have paid a price based on the gallons of coating used. Charging instead by the pound of screws coated appears to tie the price to the cost of processing such an amount of screws.

Keeping in mind the uniformity policies underlying the U.C.C. when we hold that the thrust of the coating transaction was predominantly for services, we note that our holding is in line with closely analogous mixed transaction cases from other jurisdictions. For example, in *McCool v. Hoover Equip. Co.*, 415 P.2d 954 (Okla.1966), the Supreme Court of Oklahoma found to be a predominantly service transaction an arrangement whereby a purchaser sent its crankshafts to a company which chrome-plated the shafts and returned them. Similarly, courts in various jurisdictions have held that arrangements for application of pesticides and herbicides are predominantly service transactions. *Abelman v. Velsicol Chemical Corp.*, 15 U.C.C.Rep.Serv.2d

(Callaghan) 93, 1991 WL 213402 (Md.Cir.Ct. 1991); *Grossman v. Aerial Farm Serv.*, 384 N.W.2d 488 (Minn.Ct.App.1986); *Missouri Farmers Ass'n v. McBee*, 787 S.W.2d 756 (Mo.Ct.App.1990). Finally, in *Matthews v. Metropolitan Contract Carpets*, 8 U.C.C.Rep.Serv.2d (Callaghan) 893, 1988 WL 124900 (E.D.Pa.1988), the court concluded that an agreement to strip and apply an acrylic finish to a floor was predominantly a service contract. The court reasoned:

> If the contract had simply called for TFC to supply a can of acrylic coating, the agreement would doubtless have been a sales contract. However, that TFC was brought in to strip an existing layer of wax and to lay on a new surface indicates that this was predominantly a contract to apply, rather than supply, an acrylic finish.

*Id.* at 895.

Based upon the facts of this case as well as the well-reasoned conclusions of other courts, we hold as a matter of law that the thrust of the coating agreement between Kor–It and Modern Materials was predominantly for the performance of services. The U.C.C. does not apply to the transaction, and the parties' dispute is therefore governed by our common law.

### Implied Warranties in Service Transactions

Kor–It has urged that we create an implied warranty of quality in each contract. We think that this appeal, a dispute between two commercial enterprises with very specific stated warranties, does not make the case for this proposed addition to existing contract law. Pursuant to Ind. Appellate Rule 11(B)(3), we adopt the opinion of the Court of Appeals on this issue. *Insul–Mark*, 594 N.E.2d at 464–465 (part II.).

### Applicable Statute of Limitations

■ The Court of Appeals correctly decided that it was error to dismiss the warranty claim. It held that the complaint amounted to a breach of contract claim with a six-year statute of limitations rather

than a property damage claim with a two-year statute. Pursuant to Ind. Appellate Rule 11(B)(3), we adopt that portion of the opinion of the Court of Appeals on the statute of limitations issue. *Insul–Mark*, 594 N.E.2d at 465–66 (part III.).

We therefore affirm the trial court on the applicability of the U.C.C. and reverse the trial court on implied warranties in service transactions and the statute of limitations.

DeBRULER, GIVAN, DICKSON and KRAHULIK, JJ., concur.