# IN THE COURT OF APPEALS OF TENNESSEE
## AT JACKSON
### FEBRUARY 20, 2008 Session

## FLEET BUSINESS CREDIT, LLC v. GRINDSTAFF, INC.

### Direct Appeal from the Circuit Court for Shelby County
#### No. CT-001948-03     James F. Russell, Judge

---

### No. W2007-01341-COA-R3-CV  - Filed June 30, 2008

---

This is an appeal from a trial court's grant of summary judgment. The plaintiff brought suit against the defendant, seeking the balance allegedly due under a contract between the defendant and a third party. The plaintiff contended that it was the assignee of the rights, but not the obligations, of this contract. The defendant moved for summary judgment, contending that the third party manifested its intent to terminate the contract prior to the alleged assignment. In the alternative, the defendant argued that its performance was excused because the third party filed for bankruptcy, which was a ground of default. The defendant also disputed whether there was in fact an assignment between the plaintiff and the third party. The trial court granted the defendant's motion for summary judgment. We affirm.

### Tenn. R. App. P. 3; Appeal as of Right; Judgment of the Circuit Court Affirmed

ALAN E. HIGHERS, P.J.,W.S., delivered the opinion of the court, in which HOLLY M. KIRBY, J., joined and W. FRANK CRAWFORD, J., did not participate.

Alex Darcy, Chicago, IL, Scott A. Frick, Memphis, TN, for Appellant

Robert L. Moore, Russell B. Jordan, Memphis, TN, for Appellee

# MEMORANDUM OPINION[1]

## I.  FACTS & PROCEDURAL HISTORY

On August 8, 1996, Grindstaff, Inc. ("Grindstaff" or "Appellee"), a car dealership located in Elizabethton, Tennessee, entered into a contract with Entergy Systems and Service, Inc. ("Entergy").  The agreement consisted of two documents: the Master Service Agreement and the Supplemental Service Contract.  The Master Service Agreement provided that Entergy would install and service an electrical lighting system for Grindstaff's dealership.  Apparently, Entergy's lighting system would be installed on Grindstaff's existing outdoor light fixtures, and Entergy contended that the installation would "provide the energy efficiency[,]" which they defined as "the energy used by Customer's lighting system . . . prior to installation of Contractor's technology minus the energy used by Customer's lighting system after installation of Contractor's technology."  The Supplemental Service Contract provided that Grindstaff would pay Entergy $1,290 a month in maintenance service fee payments, for a total of 120 monthly payments.   The Master Service Agreement provided, in part:

> 1. Contractor operates a nationwide energy systems maintenance service.
> 2. Contractor and Customer expect to enter into one or more agreements under which Contractor will provide its services to Customer as specified in Supplemental Service Contracts now or hereafter entered into between Contractor and Customer.
> . . .
> 1. **APPLICATION OF AGREEMENT.**  . . . The Agreement shall apply to any equipment and/or technology installed by Contractor (the "System") on the Customer's premises . . . .
> 2. **USE AND OWNERSHIP OF SYSTEM.**
> a. Contractor agrees to allow Customer to use, possess and operate the System in accordance with the terms and conditions of this Agreement.  THE SYSTEM IS CONTRACTOR'S PROPERTY.  CUSTOMER SHALL HAVE ABSOLUTELY NO RIGHT, TITLE OR INTEREST IN THE SYSTEM.
> . . .
> 5. **MAINTENANCE SERVICES.**  Contractor will maintain the System for the agreed payment . . . .

---

[1] Rule 10 (Court of Appeals).  *Memorandum Opinion.*  This Court, with the concurrence of all judges participating in the case, may affirm, reverse or modify the actions of the trial court by memorandum opinion when a formal opinion would have no precedential value.  When a case is decided by memorandum opinion  it shall be designated "MEMORANDUM OPINION", shall not be published, and shall not be cited or relied on for any reason in any unrelated case.

9.     **ACCESS TO CUSTOMER'S PREMISES.**
a.  Customer shall provide Contractor and its agents and assigns access to Customer's premises during regular working hours to install, adjust, inspect and/or maintain the System.  . . .
b.  Upon the cancellation or termination of any Supplemental Service Contract, the System described in the schedule to that contract shall be subject to immediate removal.  . . .

10.     **EXCLUSIVE EMPLOYMENT OF CONTRACTOR.** Customer shall not direct or permit any person or other entity other than Contractor (and Contractor's agents) to repair, maintain or modify any part of the System . . . except if necessary to remedy a Contractor default under Section 12 a of this Agreement.  . . .

The Master Service Agreement contained the following provisions concerning "assignment option by contractor:"

Regardless of any assignment, Contractor will remain liable to Customer for the full and punctual performance of all of Contractor's obligations under this Agreement and all related Supplemental Service Contracts.  However, the following provisions will apply to any assignee of Contractor:

a.  Upon the assignee's request, Customer will make all subsequent payments directly to the assignee.  ***No assignee will be deemed to have assumed any of Contractor's obligations.  Customer will not be relieved from any of its obligations, which shall not be subject to any reduction, abatement, defense, setoff, counterclaim or recoupment for any reason.  Customer agrees to look solely to Contractor for any remedies to which it may be entitled.***

b.  NO ASSIGNEE WILL MAKE ANY WARRANTY, EXPRESS OR IMPLIED.

c.  As to any assignee, Customer waives any rights or remedies that Customer has or may be given by virtue of Sections 2a-508 through 2a-522 of the Uniform Commercial Code, including: the right to reject the System, cancel the Supplemental Service Contract, revoke acceptance of the System, . . . or recover damages against any such assignee for breach of warranty under Article 2a of the Uniform Commercial Code.

The Master Service Agreement defined an event of default as follows:

a.   Any material failure by Contractor to perform under this Agreement or any related Supplemental Service Contract for more

than twenty (20) days after specific written notice from Customer to Contractor describing such default, unless, during such twenty-day (20) period Contractor commences diligent good faith efforts to cure such default and then continues such efforts until the default is cured; or

b. Commencement of any bankruptcy, receivership or insolvency proceeding by or against Contractor, or the appointment of a trustee or receiver for Contractor or any of its assets, or an assignment by Contractor for the benefit of its creditors, unless such proceedings is dismissed within ninety (90) days after the date of its filing.

The Supplemental Service Contract provided that "[t]his contract may be cancelled by Customer only upon the occurrence of an Event of Default by Contractor." The Master Service Agreement listed the following remedies available to Grindstaff in the event of Entergy's default:

If there is a material failure by Contractor to perform under this Agreement . . . and notice of the failure has been given under Section 11a [the aforementioned event of default section], then for the Location(s) where the failure has occurred, Customer's payments will be suspended from the time of the notice until the failure is cured.
. . . Upon the occurrence of an Event of Default by Contractor, Customer may, with or without notice to Contractor, do any one or more of the following:
. . .
b. Subject to the provisions of Section 16 below [assignment by Contractor], terminate the pertinent Supplemental Service Contract by notice to Contractor without recourse to legal process[.]

Entergy installed the lighting system and Grindstaff began making monthly payments, as per the contract. Fleet Business Credit, LLC ("Fleet" or "Appellant") contends that on August 29, 1997, Entergy assigned its rights under the Grindstaff contract to Fleet.[2] The purported assignment agreement between Entergy and Fleet is entitled "Assignment Under May 17, 1995 Agreement" and apparently bears the signature of David Browning, vice president of Entergy. Beside the signature line, the line "Dated" is left blank. A handwritten note on the same page reads "original not dated for 8/29/97." The assignment agreement does not specifically mention the Grindstaff/Entergy contract; rather, the agreement attempts to assign the "Payment Contracts" identified on Schedule A. We find no Schedule A in the record before us. There is, however, an untitled printout listing several company names, including that of Grindstaff. The purported assignment states that "the undersigned has not assigned or delegated, and the Purchaser has not assumed or promised to perform, any of the undersigned's duties or obligations under any contract or with respect to any property referred to in or covered by the Contracts." Grindstaff disputes whether an assignment

---

[2] At the time of the purported assignment, Fleet was named Sanwa Business Credit Corporation.

actually occurred, arguing that "it has not been established that assignment took place on August 29, 1997, as the purported assignment . . . is not dated and the whereabouts of the signer are unknown."

Grindstaff contends that during the first 18 months of service, it had to make a total of 39 service calls to Entergy. Thus, in October of 1998, Grindstaff states that it notified Entergy that it considered Entergy in default of the service contract. Grindstaff contends that Entergy did not attempt to cure, nor did they hear anything else from Entergy. Grindstaff did, however, continue to make payments to Entergy.

On June 24, 1999, Entergy filed for Chapter 11 bankruptcy in Louisiana.[3] The bankruptcy court named Fleet as Entergy's agent and attorney-in-fact, authorizing Fleet to "prepare, execute and deliver letters . . . to [Entergy's] obligor-counterparties under Contracts, advising such obligors of the assignment of the Contracts to [Fleet], and otherwise instructing or requesting the obligors deal exclusively with [Fleet] or its designee with respect to the contracts and the payments thereunder[.]"

In August of 1999, Grindstaff ceased making payments to Entergy.[4] Around October of 1999, Fleet sent Grindstaff an undated letter stating that a new service provider, MBW Electrical Solutions, would service Grindstaff's lighting needs in place of Entergy and that Fleet would collect the payments. The letter provides in part: "We also would like to introduce ourselves - we are Fleet [ ], and we have purchased the payments under your Lighting Contract. We have purchased Lighting Contract payments and performed billing and payment administration for [Entergy] Contracts since 1995. . . ." According to Grindstaff, this was the first time they learned of the alleged assignment between Fleet and Entergy. Grindstaff sent Fleet a letter dated January 5, 2000, responding that "[s]ince the terms of the [Entergy] contract have not been fulfilled, Grindstaff [ ] has no intention of continuing this service." **.**

On April 4, 2003, Fleet filed suit against Grindstaff, seeking the balance due under the 10 year contract between Grindstaff and Entergy, contending that it was the assignee of the rights of that contract.[5] Grindstaff filed a motion for summary judgment, asserting that Entergy's acts of default, including failure to perform under the contract and the filing of bankruptcy, excused payment.

---

[3] Entergy changed its corporate name to Efficient Solutions, Inc. prior to the bankruptcy proceeding. For clarity, we will continue to refer to the company as Entergy throughout this opinion.

[4] In its memorandum in support of its motion for summary judgment, Grindstaff contended that it ceased making payments to Entergy in October of 1998. In its brief, Grindstaff acknowledges that this date is incorrect, and that Grindstaff continued making payments to Entergy until August of 1999.

[5] The complaint sought damages in the amount of $96,074.08.

On May 16, 2007, the trial court granted Grindstaff's motion for summary judgment, finding as follows:

> 3. That at some point after the contract was entered into, Entergy attempted to assign its right to collect payments to Fleet [ ];
> . . .
> 5. That after many complaints were made by Grindstaff, Inc. to Entergy as to its failure to perform under the contract, Entergy manifested its intent to abandon the contract by failing to address these complaints.
> 6. That on June 24, 1999, Entergy filed for Chapter 11 bankruptcy;
> 7. That due to Entergy's abandonment of the contract and filing of Bankruptcy, the contract was terminated.
> 8. That Fleet attempted to offer to service the contract under another service provider, which offer Grindstaff, Inc. declined.
> 9. Because Fleet [ ] is unable to provide service under the contract and because of the termination of the contract, Grindstaff, Inc. is not liable to Fleet [ ] for any payment under the contract.
> 10. While there may be an issue of fact regarding the date of the purported cancellation by the Defendant of the contract, the Court determines that this issue of fact is not material as the contract was certainly terminated at the time that Entergy declared for bankruptcy if not earlier.

Fleet timely filed its notice of appeal.

## II. ISSUES PRESENTED

Fleet raises several issues related to the alleged assignment and a specific provision in the Master Service Agreement:

1. "Whether the assignment of payment rights is an enforceable agreement against a debtor if undated, where the parties to the assignment treat it as an enforceable agreement?"
2. Whether the rights to a personal service contract can be assigned.
3. Whether an assignment of contractual rights is effective against the debtor who does not have notice of the assignment.
4. "Whether an unconditional promise to pay clause (i.e., a 'Hell or High Water' clause) and a waiver of defense clause are enforceable by an assignee who purchases a contract for value and without notice of defenses, before any default has alleged to have been committed by the [assignor]."

We need not get into issues one, three, or four, however, as resolution of issue two ends our inquiry.

## III. STANDARD OF REVIEW

We review the trial court's decision concerning a motion for summary judgment *de novo* with no presumption of correctness. ***Abbott v. Blount County***, 207 S.W.3d 732, 735 (Tenn. 2006) (citing *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002)). Neither this Court nor the trial court should regard the summary judgement procedure "as a substitute for trial of disputed factual issues." ***Jones v. Home Indem. Ins. Co.***, 651 S.W.2d 213, 214 (Tenn. 1983); *see also* ***Doe 1 ex rel. Doe 1 v. Roman Catholic Diocese of Nashville***, 154 S.W.3d 22, 41 (Tenn. 2005). Rather, "[s]ummary judgment is appropriate only when the moving party has shown that there is no genuine issue of material fact and that the party is entitled to summary judgment as a matter of law." ***Id.*** (citing *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002)). The evidence must be viewed in a light most favorable to the non-moving party, drawing all reasonable inferences in the non-moving party's favor. ***Abbott***, 207 S.W.3d at 735 (citing *Godfrey v. Ruiz*, 90 S.W.3d 692, 695 (Tenn. 2002)). Further, all countervailing evidence must be disregarded. ***Byrd v. Hall***, 847 S.W.2d 208, 210–11 (Tenn. 1993).

In order to obtain summary judgment, the moving party must establish an affirmative defense defeating the non-moving party's claim or must affirmatively negate an essential element of the non-moving party's claim. ***Lee v. Franklin Special School Dist. Bd. of Educ.***, 237 S.W.3d 322, 330 (Tenn. Ct. App. 2007) (citing *Cherry v. Williams*, 36 S.W.3d 78, 82-83 (Tenn. Ct. App. 2000)). If, upon review, we determine that a factual dispute exists, we must then determine whether the disputed fact creates a genuine issue for trial and whether the disputed fact is material to the claim or defense upon which the summary judgment was granted. ***Id.*** (citing *Byrd v. Hall*, 847 S.W.2d 208, 214 (Tenn. 1993); *Rutherford v. Polar Tank Trailer, Inc.*, 978 S.W.2d 102, 104 (Tenn. Ct. App. 1998)); *see also* ***Draper v. Westerfield***, 181 S.W.3d 283, 288 (Tenn. 2005).

## IV. DISCUSSION

Fleet contends that the rights to Grindstaff's payments were assignable. We disagree. Generally speaking, contractual rights are assignable. *See* ***Memphis Light Gas & Water Div. v. Montgomery & Lightfoot, P.C.***, 1989 WL 89324, at *2 (Tenn. Ct. App. Aug. 10, 1989). If, however, the contract involves personal skill, trust, or confidence, then the contract is not assignable unless the obligor assented to the assignment. ***Edgewood Lumber Co. v. Hull***, 32 Tenn. App. 577, 589, 223 S.W.2d 210, 215 (Tenn. Ct. App. 1949).

In ***Berger v. Paalzow***, 40 Tenn. App. 153, 167, 289 S.W.2d 861, 867 (Tenn. Ct. App. 1956), the court dealt with a similar issue of an attempted assignment. In ***Berger***, the assignor attempted to assign the right to lease a building from the obligor to a third party assignee. The court opined that "it seems to be the rule generally that rights arising out of a contract cannot be transferred if they are coupled with liabilities, or if they involve a relationship of personal credit and confidence." ***Id.*** The court reasoned that the owner of the building entered into the contract due to his reliance on the "credit, integrity and pecuniary responsibility" of the original party/assignor, and not some unknown third party whose "business experience in managing large buildings, etc., were unknown[.]" ***Id.*** at 866-67. The court concluded that "[r]ights out of contract cannot be transferred

if they are coupled with liabilities, or if they involve a relation of personal confidence such that the party whose agreement conferred those rights must have intended them to be exercised only by him in whom he actually confided." *Id.* at 867 (quotation omitted).

In the present case, the contract in question involves the unique skill and service of Entergy. Entergy, the drafter of the contract, went to great lengths to prevent any other company from providing service using its "technology." The contract boasts that Entergy's technology would provide energy efficiency, and we do not even know that another provider would be able to fill the role of continuing Entergy's service, as the contract indicates that the technology is unique to Entergy. Nor is there any indication in the record that Grindstaff assented to the alleged assignment. It appears from the record that Grindstaff first learned of the assignment when Fleet sent the letter identifying a substitute provider, and this was after Grindstaff ceased making payments to Entergy.

Fleet makes several references to the UCC, but we find the UCC inapplicable. This is a personal service contract, not a contract for the sale/lease of goods, as Fleet contends. Here, we are dealing with a mixture of both goods and services. We must, therefore, apply the "predominant factor" or "predominant purpose test," meaning we must look to the transaction in its entirety to determine whether the predominant purpose was for the lease of goods or the provision of the service. *See Pass v. Shelby Aviation, Inc.*, No. W1999-00018-COA-R9-CV, 2000 WL 388775, at *3 (Tenn. Ct. App. Apr. 13, 2000) (citing *Insul-Mark Midwest, Inc. v. Modern Materials, Inc.*, 612 N.E.2d 550, 554 (Ind. 1993)). In doing so, we must look to the language of the contract, the nature of Entergy's business, the reason Entergy and Grindstaff entered into the contract, and the amounts charged under the contract for such goods and services. *See id.* (citations omitted).

First, looking to the language of the contract, both documents are entitled "service" agreements. The Master Service Agreement states "Contractor and Customer expect to enter into one or more agreements under which Contractor will provide *its services* to Customer . . . ." (our emphasis). As to the nature of Entergy's business, the Master Service Agreement states that "Contractor operates a nationwide *energy systems maintenance service*[.]" The Supplemental Service Agreement further describes the nature of Entergy's business as follows: "Contractor operates a nationwide maintenance service . . . ." As to the reason Entergy and Grindstaff entered into the contract:

> 2. Customer desires that Contractor upgrade Customer's [existing] lighting systems at the Locations(s) by installing equipment and technology (the "System") . . . .
> 3. Contractor intends to utilize various lighting technologies, both proprietary and non-proprietary, the goal of which is to generate sufficient savings in the operating costs of Customer's [existing] lighting system to pay for Contractor's services.
> . . .

The contract later makes clear, however, that the technology installed would remain Entergy's property. Finally, as to payment, the Supplemental Service Agreement provided that "[f]or the maintenance services rendered as described in this Contract, Customer shall make 120 monthly maintenance service fee payments of $1,290.00, plus applicable taxes." The renewal option provision in the Supplemental Service Contract also indicates that this is a contract for services, and not for goods. Viewing this transaction as a whole, we conclude that the predominant purpose was that Entergy would provide a service to Grindstaff.

And finally, although we need not address the argument relating to the "hell or highwater" clause, we do point out that this is clearly not a finance lease, as defined in Article 2 of the UCC.[6]

---

[6] Tenn. Code Ann. § 47-2A-103(g) defines a finance lease as follows:

(i) the lessor does not select, manufacture, or supply the goods;

(ii) the lessor acquires the goods or the right to possession and use of the goods in connection with the lease; and

(iii) one (1) of the following occurs:

(A) the lessee receives a copy of the contract by which the lessor acquired the goods or the right to possession and use of the goods before signing the lease contract;

(B) the lessee's approval of the contract by which the lessor acquired the goods or the right to possession and use of the goods is a condition to effectiveness of the lease contract;

(C) the lessee, before signing the lease contract, receives an accurate and complete statement designating the promises and warranties, and any disclaimers of warranties, limitations or modifications of remedies, or liquidated damages, including those of a third party, such as the manufacturer of the goods, provided to the lessor by the person supplying the goods in connection with or as part of the contract by which the lessor acquired the goods or the right to possession and use of the goods; or

(D) if the lease is not a consumer lease, the lessor, before the lessee signs the lease contract, informs the lessee in writing (a) of the identity of the person supplying the goods to the lessor, unless the lessee has selected that person and directed the lessor to acquire the goods or the right to possession and use of the goods from that person, (b) that the lessee is entitled under this chapter to the promises and warranties, including those of any third party, provided to the lessor by the person supplying the goods in connection with or as part of the contract by which the lessor acquired the goods or the right to possession and use of the goods, and (c) that the lessee may communicate with the person supplying the goods to the lessor and receive an accurate and complete statement of those promises and warranties, including any disclaimers and limitations of them or of remedies.

(continued...)

In conclusion, summary judgment was appropriate in this case. *See **Continental Cas. Co. v. Smith***, 720 S.W.2d 48, 50 (Tenn. 1986) ("Suffice it to say that this Court will affirm a decree correct in result, but rendered upon different, incomplete, or erroneous grounds.").

## V. CONCLUSION

For the aforementioned reasons, we affirm. Costs of this appeal are taxed to Appellant, Fleet Business Credit, LLC, and its surety, for which execution may issue if necessary.

_____
ALAN E. HIGHERS, P.J., W.S.

---

[6](...continued)
Tenn. Code Ann. § 47-2A-407 extends the benefits of "hell or high water" clauses to finance leases. *See* Comment 1 ("This section makes covenants in a finance lease irrevocable and independent due to the function of the finance lessor in a three party relationship: the lessee is looking to the supplier to perform the essential covenants and warranties."). There is nothing in the record to indicate that Fleet financed the contract or that they supplied Entergy with its "technology."