In the

# United States Court of Appeals

### For the Seventh Circuit

_____

No. 17-1276

PAIN CENTER OF SE INDIANA LLC,
THE PAIN MEDICINE AND
REHABILITATION CENTER P.C., and
ANTHONY ALEXANDER, M.D.,

*Plaintiffs-Appellants*,

*v.*

ORIGIN HEALTHCARE SOLUTIONS LLC,
SSIMED LLC, ORIGIN HOLDINGS, INC.,
JOHN DOES (1–50) inclusive, and
JOHN DOES (1–100) inclusive,

*Defendants-Appellees*.

_____

Appeal from the United States District Court
for the Southern District of Indiana, Indianapolis Division.
No. 1:13-cv-00133-RLY-DKL — **Richard L. Young**, *Judge*.

_____

ARGUED SEPTEMBER 6, 2017 — DECIDED JUNE 20, 2018

_____

Before WOOD, *Chief Judge*, and ROVNER and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. In June 2003 Pain Center of SE Indiana contracted with a company called SSIMED LLC for medical-billing software and related services. In June 2006 the parties entered into a second contract, this time for records-management software and related services. Almost seven years later—in January 2013—Pain Center sued SSIMED raising multiple claims for relief, including breach of contract, breach of warranty, breach of the implied duty of good faith, and four tort claims, all arising out of alleged shortcomings in SSIMED's software and services.

The district judge found the entire suit untimely and entered summary judgment for SSIMED. We affirm on all but the claims for breach of contract. The judge applied the four-year statute of limitations under Indiana's Uniform Commercial Code ("UCC"), holding that the two agreements are mixed contracts for goods and services, but the goods (i.e., the software) predominate. We disagree. Under Indiana's "predominant thrust" test for mixed contracts, the agreements in question fall on the "services" side of the line, so the UCC does not apply. The breach-of-contract claims are subject to Indiana's ten-year statute of limitations for written contracts and are timely. The suit may go forward only on those claims.

## I. Background

The plaintiffs are Pain Center of SE Indiana LLC, a clinic serving patients who suffer from chronic pain; its founder and sole member, Dr. Anthony Alexander; and its corporate successor, The Pain Medicine and Rehabilitation Center P.C. We refer to the plaintiffs collectively as "Pain Center." The defendants are SSIMED LLC; Origin Healthcare Solutions LLC, the corporation that acquired SSIMED LLC in 2005;

and Origin Holdings, Inc., its indirect parent corporation. We refer to them collectively as "SSIMED." The suit also names 150 John Does as defendants, but as we explain later, these nominal placeholders can be disregarded.

SSIMED provides billing services to healthcare providers through proprietary billing and records-management software. Its software line includes Practice Manager, a billing program that functions as a platform for submitting claims to SSIMED for transmission to insurers, and EMRge, a records-management software that works in conjunction with Practice Manager. On June 18, 2003, Pain Center entered into an agreement with SSIMED to purchase the Practice Manager software and related services, including ongoing billing services, IT support and electronic claim-submission services, and five days of initial training in how to use the software.

Filing claims using SSIMED's billing system involves several steps. First, at the end of each day, the healthcare provider enters into the Practice Manager program the relevant claim information for all reimbursable healthcare services performed that day. The software then transmits the daily closing files to SSIMED in a zip file, and SSIMED generates claim files from the daily closing information and sends claims to insurers for payment.

Claim processing can fail at any step of this process. Certain data-entry errors by the healthcare provider may prevent successful transmission of daily closing files to SSIMED. Other errors would not impede transmission to the insurer but can result in nonpayment of the claim. The healthcare provider can track the status of its claims using a software tool called the Client Center. Claims with errors at

any step of the process remain in the Client Center until corrected and resubmitted.

Dr. Alexander testified in deposition that Pain Center experienced problems with Practice Manager "[a]lmost from the beginning." More specifically, Dr. Alexander noticed "[p]roblems with accuracy in the amounts that were sent," "[p]roblems with dates missing," and "entire transmissions that had been resent [and then were] missing." Dr. Alexander confronted SSIMED about these problems in 2003, and SSIMED told him that the insurers were to blame for any unpaid claims. Dr. Alexander testified that Pain Center followed up with health insurers "on numerous occasions," but the insurers reported that they never received the claims. Soon after implementing Practice Manager, Dr. Alexander noticed that Pain Center was "losing money like crazy." But he insists that he did not realize until much later that SSIMED's software and services were to blame for his cashflow problems.

Despite these concerns, Pain Center entered into a second contract with SSIMED on June 28, 2006—this time for a software program called EMRge that worked in conjunction with Practice Manager to facilitate patient records management and billing reimbursement. Like the first contract, this one included the software, five days of initial training in its use, ongoing billing services, and IT support. Dr. Alexander thought that implementing EMRge would resolve the payment losses his clinic was suffering. But just as with Practice Manager, he experienced problems with EMRge "[a]lmost from the beginning."

In October 2011 Pain Center hired Demetria Hilton Pierce, a billing specialist, and she immediately noticed that

some of Pain Center's claims were going unpaid. Pierce asked SSIMED about the unpaid claims. SSIMED directed her to log in to the Client Center. When she did so, she discovered that the Client Center had not been opened in about 18 months. Thousands of unpaid claims had piled up in the meantime. For many of these claims, the deadline for submission to the insurer had passed. Pain Center made an effort to recover payment, but the insurers refused to pay the stale claims. Dr. Alexander maintains this was the first time he learned of the Client Center and how it functioned.

On January 24, 2013, Pain Center filed suit against SSIMED alleging that its Practice Manager and EMRge software and related billing services caused these losses. As relevant here, the complaint raised several contract-based claims (breach of contract, breach of warranty, and breach of the implied duty of good faith and fair dealing) and four tort claims (tortious interference with business relations, fraud, fraud in the inducement, and fraudulent misrepresentation).

On cross-motions for summary judgment, the judge concluded that the statute of limitations for each claim had long since expired. The judge ruled that all of Pain Center's claims accrued soon after the execution of the two agreements in 2003 and 2006, respectively, because Dr. Alexander admitted that he was aware of problems with SSIMED's billing system "[a]lmost from the beginning." Under Indiana law, fraud claims are subject to a six-year statute of limitations, so this accrual ruling meant that all three fraud-based claims were time-barred. The tortious-interference claim was likewise untimely under the applicable two-year limitations period. The judge also concluded that all of the contract-based claims are governed by the UCC because the agree-

ments in question were predominantly for the sale of goods—that is, the software. Indiana UCC claims are subject to a four-year statute of limitations, so the judge held that these claims too were untimely. Finally, the judge rejected Pain Center's argument that equitable tolling saved its claims.

## II. Discussion

Before turning to the merits of the judge's timeliness rulings, we pause to address a lingering doubt about subject-matter jurisdiction. As we've explained, the operative complaint names as defendants John Does 1–100 (identified only as shareholders, promoters, or subscribers of Origin Holdings, Inc.) and John Does 1–50 (identified only as individuals, corporations, or associations that are somehow responsible for Pain Center's damages). The parties do not mention the John Does in their jurisdictional statements, but we have an independent duty to verify subject-matter jurisdiction. *Dexia Crédit Local v. Rogan*, 602 F.3d 879, 883 (7th Cir. 2010).

The jurisdictional basis for this suit is diversity of citizenship, *see* 28 U.S.C. § 1332, which requires complete diversity between the parties.[1] All of the plaintiffs are citizens of Indiana, and the complaint alleges "upon information and belief" that the John Does are *not* citizens of Indiana. But without knowing who or what the John Does might be, their citizenship remains a mystery. Because the prerequisites for

---

[1] The original complaint included a federal Lanham Act claim, but that claim dropped out early on; nothing in the record suggests that the judge opted to retain supplemental jurisdiction over the remaining state-law claims.

diversity jurisdiction must be proved and not presumed, John Doe defendants are ordinarily forbidden in federal diversity suits. *Howell ex rel. Goerdt v. Tribune Entm't Co.*, 106 F.3d 215, 218 (7th Cir. 1997).

An exception applies when the John Does are nominal parties—nothing more than placeholders "in the event that during discovery [the plaintiff] identifie[s] any additional defendants he wishe[s] to add to the suit." *Moore v. Gen. Motors Pension Plans*, 91 F.3d 848, 850 (7th Cir. 1996). We've held that "the citizenship of such defendants can be disregarded for diversity jurisdiction." *Dalton v. Teva N. Am.*, No. 17-1990, 2018 WL 2470634, at *1 (7th Cir. June 4, 2018) (citing *Moore*, 91 F.3d at 850); *see also Howell*, 106 F.3d at 218. The 150 John Does are mere placeholders, so we can safely ignore them for purposes of diversity jurisdiction. Complete diversity otherwise exists, so our jurisdiction is secure.

With that preliminary matter resolved, we proceed to the merits. We review the summary-judgment order de novo, construing the evidence and drawing inferences in Pain Center's favor. *Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.*, 849 F.3d 355, 361 (7th Cir. 2017).

## A. Contract-Based Claims

### 1. *Breach of Contract*

The timeliness of Pain Center's claims for breach of contract depends on whether the contracts fall within the UCC. If the contracts are for the sale of goods and the UCC applies, then the claims are subject to a four-year limitations period, *see* IND. CODE § 26-1-2-725(1), which expired long before Pain Center filed suit. If the UCC does not apply, then the claims are subject to Indiana's ten-year statute of limita-

tions for written contracts and are timely.[2] *See id.* § 34-11-2-11.

The judge held that the UCC's four-year limitations period applies, reasoning that the agreements in question are mixed contracts for goods and services in which goods predominate. The judge correctly identified the test used in Indiana for resolving a question like this but erred in its application.

Where a contract involves the purchase of a "pre-existing, standardized software," Indiana courts treat it as a contract for the sale of goods governed by the UCC. *Olcott Intern. & Co. v. Micro Data Base Sys., Inc.*, 793 N.E.2d 1063, 1071 (Ind. Ct. App. 2003). On the other hand, where a contract calls for the design of software to meet the buyer's specific needs, Indiana treats it as a services contract. *Data Processing Servs., Inc. v. L.H. Smith Oil Corp.*, 492 N.E.2d 314, 318–19 (Ind. Ct. App. 1986), *rev'd on other grounds*, *Insul–Mark Midwest, Inc. v. Modern Materials, Inc.*, 612 N.E.2d 550, 554 (Ind. 1993). For example, in *Conwell v. Gray Loon Outdoor Marketing Group, Inc.*, 906 N.E.2d 805, 812 (Ind. 2009), the court held that the UCC does not apply where one party

---

[2] In an alternative ruling, the judge held that if the UCC does not apply, then the contract claims are subject to Indiana's six-year statute of limitations for "action[s] upon promissory notes, bills of exchange, or other written contracts for the payment of money." IND. CODE § 34-11-2-9. On this alternative view, the claims are also untimely. But as SSIMED conceded at oral argument, the judge's alternative ruling was incorrect. Indiana interprets "contracts for the payment of money" narrowly; this category includes only contracts that establish an obligation to pay money and excludes agreements to pay money in exchange for something else. *Folkening v. Van Petten*, 22 N.E.3d 818, 822 (Ind. Ct. App. 2014).

hires the other to design a custom website and provide webhost services.

Here it's clear that Pain Center licensed SSIMED's preexisting, standardized software. SSIMED's sales representative Joy Deckard testified in deposition that the licensing agreements involved "standardized," "out-of-the-box-type software." She also explained that SSIMED does not design custom software to meet the needs of individual healthcare providers. She acknowledged that a healthcare provider could make minor changes to the standardized software, but she did not elaborate on the precise extent of this capability.

In response Pain Center points to evidence that it asked for (and obtained) minor modifications within the confines of the standardized software. Dr. Alexander testified that he asked SSIMED to add a question to a patient survey and SSIMED did so. Pain Center's billing specialist testified that at her request SSIMED arranged for the payment amounts associated with certain billing codes to automatically populate in the software. Setting up field auto-population and adding a single survey question to a preexisting, standardized software program does not convert it into custom software designed specifically for a particular purchaser.

Pain Center also seizes on one of SSIMED's interrogatory answers stating that it "created [p]laintiffs' database from the ground up." But as SSIMED explains, this meant only that it used its standardized software to create a database with Pain Center's information: provider names, referring physicians, and procedure codes. That is, SSIMED used its preexisting, standardized software to serve Pain Center's objectives; it did not design a new, customized software program for its client.

Finally, Pain Center relies on contract language contemplating the possibility of purchasing custom programming services. But there's no evidence that Pain Center ever purchased these services or that SSIMED ever offered them. In sum, because the Practice Manager and EMRge programs were preexisting and standardized, we agree with the district judge that the software should be treated as a good. And because the two software programs are properly classified as goods, the contracts between SSIMED and Pain Center are appropriately characterized as mixed contracts for both goods and services.

To determine whether the UCC applies to a mixed contract for both goods and services, Indiana uses the "predominant thrust test." *Insul–Mark Midwest*, 612 N.E.2d at 554. Indiana courts ask whether the predominant thrust of the transaction is the performance of services with goods incidentally involved or the sale of goods with services incidentally involved. *Id.* To determine whether services or goods predominate, the test considers (1) the language of the contract; (2) the circumstances of the parties and the primary reason they entered into the contract; and (3) the relative costs of the goods and services. *Id.* at 555.

Here the language of the contracts is largely a neutral factor, though in some limited respects it points toward a conclusion that services predominate. Each agreement is a single double-sided sheet of paper: the front is a simple order form; the back supplies the terms and conditions of the agreement. The front also identifies services (e.g., "Monthly Services & Support," "On-site training") as well as software ("SSIMED EMRge" and "SSIMED Practice Manager Suite"). Pain Center paid for monthly billing services and IT support

for the life of the contracts; the services are described on the back page as including "telephone support," "on-line support," and "electronic claim submission." The back of the Practice Manager contract also lists the various software modules incorporated in the Practice Manager software, including modules for collections, appointment scheduling, and electronic-claim submission, among others. In short, the language of the contract provides slight support for a conclusion that the predominant focus of these agreements was ongoing billing and IT services and that the software was a tool that allowed SSIMED to perform those services.

The next step in the predominant-thrust test asks us to examine the parties' circumstances to determine whether their primary reason for entering the contract was the goods or the services component. Pain Center argues that its primary reason for executing these agreements was to obtain SSIMED's billing services and that the software was merely a conduit to transfer claims data to SSIMED to allow it to perform those services. SSIMED counters that the parties' focus was software—not services—because Pain Center used the software day in and day out; it points out that the initial training on the programs lasted a total of only ten days.

Pain Center has the better of this debate. SSIMED overlooks that Pain Center received monthly billing and IT services for the life of both contracts. In fact, Deckard testified that SSIMED licensed its software *only* when purchased in conjunction with billing and support services. Pain Center used the software to input its daily insurance claims and transmit the data via zip file to SSIMED's billing system. After receiving a zip file from Pain Center, SSIMED generated claims files and submitted them to insurers. If the insurer

refused to pay a claim due to an error, SSIMED placed them in the Client Center to be corrected. The software was merely the vehicle through which Pain Center communicated its claims information to SSIMED in order to access its billing and collection services. This second factor weighs heavily in favor of a conclusion that services predominate and that the goods were incidental.

The third and final factor—the relative cost of the goods and services—also points toward that conclusion. As the Indiana Supreme Court has explained, "[i]f the cost of the goods is but a small portion of the overall contract price, such fact would increase the likelihood that the services portion predominates." *Insul–Mark Midwest*, 612 N.E.2d at 555. Under the Practice Manager agreement, Pain Center paid a one-time licensing fee of $8,000 for software; a one-time training fee of $2,000; and $224.95 each month for services and support for about nine years. Thus, for the life of the Practice Manager agreement, the services totaled approximately $26,294—more than three times the $8,000 licensing fee for the software. Under the EMRge agreement, Pain Center paid a one-time licensing fee of $23,275 for the software; a one-time training fee of $4,000; and $284 per month for services and support for about six years. Thus, the services totaled about $24,448—slightly more than the $23,275 software licensing fee. The relative-cost factor reinforces the conclusion that services predominate.

On balance, then, the predominant thrust of the two agreements is medical billing and IT services, not the sale of goods. So the UCC and its four-year limitations period do not apply. Instead, the breach-of-contract claims are subject

to Indiana's ten-year statute of limitations for written contracts and are timely.

Before moving on, we take a moment to address SSIMED's argument that we should affirm on the alternative ground that Pain Center cannot show causation or damages. This requires only brief comment.

SSIMED's argument regarding causation is as follows: Pain Center's claims hinge on its assertion that a software defect caused its losses; expert testimony is required to show that a software defect caused the losses; and the judge ruled that Pain Center's proffered expert, Mark Anderson, can testify that the software's "poor functionality or interface" caused Pain Center's damages, but he is unqualified to testify that "software defects" caused Pain Center's damages—hence, the contract claims fail.

But the breach-of-contract claims do *not* hinge on a contention that a software defect caused the losses. Pain Center asserts that SSIMED failed to satisfy its contractual obligations and caused losses in a number of respects: it (1) inadequately trained Pain Center employees; (2) did not reliably submit claims to insurers; and (3) failed to notify Pain Center of problems with claims. Pain Center may prevail on its breach-of-contract claims without proving a particular defect in SSIMED's software.

Regarding damages, SSIMED argues that Pain Center's proffered expert testimony is entirely speculative. Because Pain Center has offered other evidence of damages—including Dr. Alexander's testimony that thousands of claims went unpaid by insurers—we do not need to wade

into questions about the admissibility of the damages expert's testimony.

Pain Center mounts a halfhearted effort to convince us to find as a matter of law that SSIMED breached the contracts and is liable for $15 million in damages. That's a serious overreach. Many material factual disputes remain on the questions of breach, causation, and damages. Indeed, Pain Center's own expert could give only a loose range of the healthcare practice's damages from unpaid claims: somewhere between $7.2 million and $15 million. We hold only that the breach-of-contract claims are timely. On remand Pain Center will have to prove its entitlement to relief.

### 2. *Breach of Warranty*

Pain Center also raised claims for breach of the implied warranty of fitness for a particular purpose and the implied warranty of merchantability. These are UCC claims, *see* IND. CODE §§ 26-1-2-315, -314, and we've just explained why the UCC does not apply. The Indiana Supreme Court has declined to create a common-law equivalent of the UCC's implied-warranty cause of action in cases between merchants dealing at arm's length. *See Insul–Mark Midwest*, 612 N.E.2d at 556. Judgment for SSIMED on these claims was therefore appropriate, though on a different ground.

### 3. *Breach of Implied Covenant of Good Faith*

Pain Center's final contract-based claim is one for breach of the covenant of good-faith performance, which the UCC implies in every contract. *See* IND. CODE § 26-1-1-203. Because the UCC does not apply, this claim drops out too. We note for completeness that this section of the UCC "does not support an independent cause of action for failure to per-

form or enforce in good faith." *Id.* cmt. (West 2018). And in Indiana a common-law duty of good faith and fair dealing arises "only in limited circumstances, such as when a fiduciary relationship exists." *Del Vecchio v. Conseco, Inc.*, 788 N.E.2d 446, 451 (Ind. Ct. App. 2003). No fiduciary relationship exists here. Finally, and in any event, such a claim is subject to a two-year limitations period, *id.* (citing IND. CODE § 34-11-2-4(2)), which has long since expired. The claim fails for a host of reasons.

## B. Tort Claims

Pain Center's remaining claims sound in tort. The three fraud claims are subject to a six-year limitations period, *see* IND. CODE § 34-11-2-7(4), and here we agree with the district judge that they are clearly time-barred. Dr. Alexander testified unequivocally that (1) SSIMED's software and services did not function as promised "from the beginning"; (2) he promptly confronted SSIMED about these failures and was told that the insurers were to blame; and (3) he followed up with the insurers "on numerous occasions" and was told that they never received the claims. This testimony establishes that Dr. Alexander was well aware soon after implementing SSIMED's billing system in June 2003 and June 2006 that the SSIMED software and services were the source of his billing problems—not the insurance companies—and thus that potential claims for misrepresentation existed.

Pain Center contends that the fraud claims accrued anew each time SSIMED repeated the same alleged misrepresentations. But one of the essential elements of Indiana common-law fraud is that the misrepresentation "was rightfully relied upon by the complaining party." *Kesling v. Hubler Nissan, Inc.*, 997 N.E.2d 327, 335 (Ind. 2013). Once Pain Center was

on notice that it had been bamboozled, it could not continue to rely on those same alleged misrepresentations when SSIMED repeated them.

Pain Center also seeks recovery for tortious interference with business relations. The theory underlying this claim is hazy, but the argument seems to be that SSIMED's inadequate software and services led to so many unpaid claims that Pain Center was unable to take advantage of business opportunities. This claim is subject to a two-year limitations period. IND. CODE § 34-11-2-4(a); *Miller v. Danz*, 36 N.E.3d 455, 457 (Ind. 2015). Here again, because Dr. Alexander knew in 2003 and 2006 that SSIMED's software and services were not performing as represented—and indeed, that his clinic was suffering obvious cash-flow problems during this period—this claim is plainly time-barred.

Pain Center makes a last-ditch plea for equitable tolling based on the doctrines of fraudulent concealment and "continuing wrong." Indiana recognizes that a defendant's fraudulent concealment of a cause of action tolls the statute of limitations. IND. CODE § 34-11-5-1. Moreover, under Indiana's continuing-wrong doctrine, when a wrong occurs outside the limitations period and closely related wrongs occur within the limitations period, the plaintiff can recover for all wrongs. *Marion County v. Indiana*, 888 N.E.2d 292, 299 (Ind. Ct. App. 2008). But neither doctrine tolls the statute of limitations if the plaintiff obtains information that should lead to the discovery of the cause of action. *Snyder v. Town of Yorktown*, 20 N.E.3d 545, 551 (Ind. Ct. App. 2014); *C&E Corp. v. Rambo Indus., Inc.*, 717 N.E.2d 642, 645 (Ind. Ct. App. 1999). Pain Center had actual knowledge of potential causes of action in 2003 and 2006, which is outside the statutory

limitations period for all of the tort claims. Equitable tolling cannot save them.

Accordingly, we REVERSE the judgment only with respect to the claims for breach of contract and REMAND for further proceedings.[3] In all other respects, the judgment is AFFIRMED.

---

[3] Pain Center asks us to reassign the case to a different judge pursuant to Circuit Rule 36. We see no reason to do so.